23-2022

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

MYPAQ HOLDINGS LTD.,

Appellant,

v.

SAMSUNG ELECTRONICS CO., LTD.,

Appellee.

---

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2022-00307.

_____

### BRIEF OF APPELLANT
### MYPAQ HOLDING LTD.

_____

James T. Carmichael*
Stephen P. McBride
Mitch Yang*
CARMICHAEL IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons Corner, VA 22182
(703) 646-9255
jim@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com
*Not admitted in Virginia
Counsel for Appellant MyPAQ Holding Ltd.

September 22, 2023

## <u>PATENT CLAIMS AT ISSUE</u>

### <u>U.S. Patent No. 7,403,399, Claim 10[1]:</u>

1. Circuit arrangement for a switch-mode power supply, wherein the switch-mode power supply has a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer,

> wherein the circuit arrangement (100) comprises a primary-sided switch (102), a control circuit (104) for controlling the primary-sided switch (102) and additional active, primary-sided components (106, 108, 110),

> wherein said control circuit (104) is formed by a first integrated semiconductor chip and the primary-sided switch (102) and the additional components (106, 108, 110), are integrated in at least one additional semiconductor chip, said semiconductor chip being separate from the control circuit and arranged on a circuit carrier (112) shared with the control circuit.

10. Circuit arrangement according to claim 1, wherein the additional active components (106, 108, 110) are at least partially combined into a single semiconductor chip and are **monolithically integrated**.

---

[1] Although independent claim 1 was previously disclaimed, this appeal raises errors in the PTAB's decision involving claim 10, which depends from claim 1. All emphasis added unless stated otherwise.

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**    23-2022

**Short Case Caption**    MyPAQ Holdings Ltd. v. Samsung Electronics Co. Ltd.

**Filing Party/Entity**    MyPAQ Holdings Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/22/2023

Signature: /s/ Stephen P. McBride

Name: Stephen P. McBride

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| MyPAQ Holdings Ltd. | | Transpacific IP Group Limited |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Carmichael IP, PLLC | James T. Carmichael | Baker Botts LLP |
| Stephen P. McBride | Minghui (Mitch) Yang | Eliot D. Williams |
| Neil Sirota | Eric J. Faragi | Frank Zhu<br>Brett Thompsen |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES..................................................................1

STATEMENT OF JURISDICTION..................................................................2

STATEMENT OF THE ISSUES........................................................................2

STATEMENT OF THE CASE............................................................................3

STATEMENT OF FACTS..................................................................................3

      A.     The '399 Patent on Appeal ................................................3

      B.     The Prior Art ......................................................................6

            1.    Zverev (U.S. Patent No. 6,873,136)...........................6

            2.    Liaw (U.S. Patent No. 6,294,904) ..............................7

            3.    Nam (U.S. Patent Application Publication 2003/0102489) and Lin (U.S. Patent No. 5,491,360) ........................7

SUMMARY OF THE ARGUMENT ....................................................................8

ARGUMENT ......................................................................................................9

I.      STANDARD OF REVIEW ..........................................................9

II.     THE BOARD APPLIED AN INCORRECT CLAIM CONSTRUCTION FOR CLAIM 10 THAT SHOULD BE REVERSED ON *DE NOVO* REVIEW ..........................................9

      A.     The Parties' Agreed Construction of "Monolithically Integrated" is Correct ........................................................9

      B.     The Board's Final Decision Purported to Adopt the Parties' Agreed, Correct Construction of "Monolithically Integrated" but Implicitly Applied a Different, Incorrect Construction..........14

**III.**    **THE PRIOR ART FAILS TO DISCLOSE "MONOLITHICALLY INTEGRATED" UNDER THE AGREED, CORRECT CONSTRUCTION**...................................................................**19**

**IV.**    **CONCLUSION** ........................................................................**23**

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014) ................................................. 14, 22

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ...............................................12

*In re Magnum Oil Tools International, Ltd.*,
    829 F. 3d 1364 (Fed. Cir. 2016) .......................................19

*LG Elecs. Inc. v. Immervision, Inc.*,
    Case No. 21-2037, F.4th 1364 (Fed. Cir. 2022) ...................................9

*Linear Technology v. Int'l Trade Comm'n*,
    566 F.3d 1049 (Fed. Cir. 2009) .......................................15

*Pause Technology LLC v. TiVo Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005) .......................................22

*Qualcomm Inc. v. Intel Corp.*,
    6 F.4th 1256 (Fed. Cir. 2021) ................................................. 9, 18

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987) .......................................13

*The Johns Hopkins University v. Datascope Corp.*,
    543 F.3d 1342 (Fed. Cir. 2008) .......................................20

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
    17 F.4th 155 (Fed. Cir. 2021) .......................................9

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) .......................................9

**Statutes**

28 U.S.C. § 1295 ....................................................................2

35 U.S.C. § 141 ....................................................................2

35 U.S.C. § 319 ................................................................................................ 2

35 U.S.C. § 6 .................................................................................................... 2

## STATEMENT OF RELATED CASES

This is an appeal from *Samsung Electronics Co. LTD., v. MyPAQ Holdings LTD.,* Case No. IPR2022-00307 (PTAB Dec. 13, 2021), filed in the in the United States Patent and Trademark Office Patent Trial and Appeal Board ("PTAB" or "Board"). No appeal in or from the same proceeding in the PTAB was previously before this Court or any other appellate court.

Appellant MyPAQ Holding LTD. ("MyPAQ" or "Patent Owner") has asserted U.S. Patent No. 7,403,399 ("the '399 Patent") in the following district court case:

- *MyPAQ Holdings Ltd. v. Samsung Electronics Co., Ltd., et. al*, Case No. 6:21-CV-00398 (W.D. Tex.);

MyPAQ's counsel is not aware of any other case in this Court, in any other court, or before the Patent Trial and Appeal Board that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The PTAB had jurisdiction under 35 U.S.C. § 6 over IPR2022-00307 that is the subject of this appeal. The PTAB issued its Final Written Decision ("Final Decision") in IPR2022-00307 on May 15, 2023. Appx1-46 [Final Decision]. MyPAQ timely filed a notice of appeal on June 8, 2023. Appx436-440 [Notice of Appeal]. This Court has jurisdiction under 35 U.S.C. § 141(c) and 319 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1. Did the Board err as a matter of law by implicitly applying a different, incorrect construction of "monolithically integrated" than the correct construction agreed to by the parties?

## STATEMENT OF THE CASE

Appellant MyPAQ Holdings, LTD. ("MyPAQ" or "Patent Owner") is the owner of U.S. Patent No. 7,403,399 (the "'399 Patent). On December 13, 2021, Appellee Samsung Electronics Co., LTD ("Samsung") filed IPR2022-00307 with the U.S. Patent and Trademark Office ("USPTO") requesting *inter partes* review of claims 1–6, 10, and 13 of the '399 Patent. Appx57-150 [Petition for *Inter Partes* Review].

On May 23, 2022, the Board instituted the -00307 IPR. Appx261-274 [Decision Granting Institution]. After institution of trial, MyPAQ statutorily disclaimed claims 1-5 and 13 of the '399 Patent, leaving only claims 6 and 10 at issue in the -00307 proceeding. Appx1458-1464. The Board issued its Final Decision finding claims 6 and 10 unpatentable on May 15, 2023. Appx1-46 [Final Decision]. Patent Owner timely appealed on June 8, 2023. Appx436-440 [Notice of Appeal].

## STATEMENT OF FACTS

### A.    The '399 Patent on Appeal

The '399 Patent involves improvements to circuits for a switch-mode power supply having a primary side connected to a supply voltage and a secondary, consumer-facing, side. Appx47, Appx51 ['399 Patent]. The inventors of the '399 Patent recognized that existing switch-mode power supplies utilizing off the shelf circuit elements such as rectifiers and diodes had reached the limits of their

miniaturization. Appx51-52 ['399 Patent]. Further miniaturization required

integration of previously separate circuit components. Appx51-52 ['399 Patent].

At the same time, the inventors also recognized that integrating all the active

components of the switch-mode power supply circuit on a single chip "does not

make possible primary/secondary separation according to applicable standards"

and led to high manufacturing costs. Appx51 ['399 Patent]. Accordingly, the '399

Patent proposes a solution in which the power supply circuit is divided between at

least two separate integrated semiconductor chips arranged on a shared circuit

carrier: (1) a first chip having the control circuit and (2) a second chip having the

primary-sided switch and additional active, primary-sided components. Appx51-

52 ['399 Patent].

To achieve even further miniaturization of the switch-mode power supply

circuit, the '399 Patent additionally discloses that the additional active, primary-

sided components should be "monolithically integrated." Appx52-53 ['399

Patent]. "Monolithic integration" of the additional active components as described

by the '399 Patent was understood by the field at the time of invention to mean

forming the additional active components on a single piece of semiconductor

material. Appx1481-1484 [Ferrese Decl.]. This specific design significantly

reduced the size of the switch-mode power supply circuit. Appx53 ['399 Patent]

("With the help of this technology, further miniaturisation of the module 100 can

be achieved, because a compact construction of the individual constituents of the
circuit results from the monolithic integration."). For example, Figure 3 shows an
embodiment in which "all four diodes are integrated on one die in silicon-on-
insulator (SOI) technology":



FIG. 3

Appx49 ['399 Patent]. "By using a monolithically integrated element for the
bridge rectifier 106, it is possible to reduce the required area from about 20 mm$^2$
to about 12 mm$^2$." Appx53 ['399 Patent].

The disclosed application of monolithic integration reduces the space
required by the power supply circuit while conforming to applicable industry
standards. Appx53 ['399 Patent]. Thus, the inventive circuit arrangement allows
for lower heights compared to single components; for example, elements
integrated into a MLP (Micro Leadframe Package) housing may have a height of
only 1 mm. Appx52 ['399 Patent]. "Further miniaturization of the overall

arrangement can be achieved by means of additional monolithic integration of multiple elements within the circuit arrangement." Appx53 ['399 Patent].

## B.    The Prior Art

### 1.    Zverev (U.S. Patent No. 6,873,136)

Zverev describes a switch-mode power supply having a rectifier arrangement, a switching transistor, and a control circuit for controlling the switching transistor. Appx574, Appx584 [Zverev]. Zverev utilizes a power MOSFET T1 acting as a controllable semiconductor switch, a MOSFET T2 acting as a current source, and a sense MOSFET T3. Appx586-588 [Zverev]. The control circuit is integrated on a first semiconductor chip CH2, while the power MOSFET T1, the MOSFET T2 acting as a current source, and the sense MOSFET T3 are integrated on a second semiconductor chip CH1, as shown in Fig. 2. Appx582, 586-588 [Zverev].



Appx582 [Zverev]. Critically, while Zverev discloses certain switch-mode power supply circuits, Zverev does not describe that the chips used in its circuits are

"monolithically integrated." This was independently confirmed by both

Samsung's and MyPAQ's experts. Appx1522-1523 [Elenius Deposition

Transcript]; Appx1495-1496 [Ferrese Declaration].

### 2.    Liaw (U.S. Patent No. 6,294,904)

Liaw discloses a power chip set for a switching mode power supply.

Appx595, Appx600 [Liaw]. The power chip set includes a high voltage chip and a

control unit chip. Appx600 [Liaw].  The high voltage chip contains high voltage

circuit elements, so that high voltage is not applied to the control circuits

contained in the control chip. Appx600-601 [Liaw].  The high voltage chip

includes a power MOS transistor that serves as the switching transistor and further

includes additional elements including a junction FET and another power MOS

transistor that serves as a current sense transistor to detect the drain current of the

switching transistor. Appx600-601 [Liaw]. Like Zverev, Liaw does not describe

whether the chips used in its circuits are "monolithically integrated." Appx1494-

1496 [Ferrese Decl.].

### 3.    Nam (U.S. Patent Application Publication 2003/0102489) and Lin (U.S. Patent No. 5,491,360)

The Petition relies on two additional references, Nam and Lin, for elements

of claim 1 which are not relevant to this appeal. Appx76-78, Appx96-97,

Appx131-132, Appx143 [Petition]. Samsung relies exclusively on Zverev and

Liaw to teach claim 10; this Court therefore need not consider Nam or Lin. Appx96-97, Appx131-132, Appx143 [Petition].

## SUMMARY OF THE ARGUMENT

In the underlying IPR proceedings of the instant appeal, the parties agreed that "monolithically integrated" as recited in claim 10 means "fabricated from a single piece of semiconductor material." Appx12-13 [Final Decision]. The Board's Final Decision, noting the agreement by the parties, purported to adopt this construction. Appx13 [Final Decision]. Nevertheless, when evaluating whether the prior art taught "monolithically integrated" as recited by claim 10, the Board jettisoned the parties' agreed construction and instead applied a different construction of "monolithically integrated" in its analysis. Appx35-43 [Final Decision]. Specifically, whereas the Board should have considered whether the prior art circuits were "***fabricated from*** a single piece of semiconductor material" as required by the parties' agreed construction, the Final Decision instead determined that the prior art circuits were "***on*** a single piece of semiconductor material." Appx35-43 [Final Decision]. The Board thus committed legal error by *sua sponte* changing the construction of "monolithically integrated" from the correct construction agreed by the parties to a new, erroneous construction. Appx13, Appx35-43 [Final Decision]. For this reason, MyPAQ respectfully requests that the Final Decision be reversed.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court "review[s] questions of claim construction *de novo*." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1266 (Fed. Cir. 2021) (*citing Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015)).

Anticipation and obviousness are legal questions based on underlying findings of fact. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021). This Court reviews the Board's ultimate determinations of anticipation and obviousness *de novo*. *Id*.,; *LG Elecs. Inc. v. Immervision, Inc.*, 39 F.4th 1364, 1371 (Fed. Cir. 2022).

## II.   THE BOARD APPLIED AN INCORRECT CLAIM CONSTRUCTION FOR CLAIM 10 THAT SHOULD BE REVERSED ON *DE NOVO* REVIEW

This Court should apply *de novo* review and reverse the Board's implicit construction of claim 10.

### A.    The Parties' Agreed Construction of "Monolithically Integrated" is Correct

Claim 10 of the '399 Patent requires that "the additional active components [of claim 1] are at least partially combined into a single semiconductor chip and are monolithically integrated." Appx53 ['399 Patent]. By its explicit language, claim 10 requires that the active components be both (1) at least partially

combined into a single semiconductor chip and (2) are monolithically integrated.

Appx301-304 [Patent Owner Response].

In the proceeding below, MyPAQ presented **_unchallenged_** intrinsic and

extrinsic evidence that "monolithically integrated" means "fabricated from a

single piece of silicon." Appx301-304 [Patent Owner Response], Appx12-13

[Final Decision]. In view of this unchallenged evidence, "Samsung agree[d]" with

MyPAQ's construction except in one respect:

> Samsung submit[ted] that 'monolithically integrated' means
> 'fabricated from a single piece of semiconductor material (such as
> silicon)' which is slightly broader than 'fabricated from a single piece
> of silicon.' While silicon is the material most commonly used to
> fabricate semiconductor dies, other semiconductor materials can be
> used.

Appx346-347 [Petitioner's Reply]; Appx1110 [Elenius Reply Declaration] ("[A]

POSITA would have understood the correct construction of 'monolithically

integrated' in claim 10 to be 'fabricated from a single piece of semiconductor

material (such as silicon).'"). Notably, Samsung took issue **_only_** with the type of

material that may be used in the fabrication, but did not dispute that the

fabrication itself must be from a single piece of semiconductor material. *Id*.

MyPAQ agreed that the Board should adopt the construction with Samsung's

modification, which the Final Decision purported to do. Appx362-363 [Sur-

Reply]; Appx12-13 [Final Decision] ("In view of the agreement between the

parties, we apply the parties' proposed joint construction of 'monolithically

integrated' as 'fabricated from a single piece of semiconductor material.'"). Thus, both parties and the Board appeared to understand that "monolithically integrated" meant "fabricated from a single piece of semiconductor material." *Id*.

This construction is supported by both the intrinsic and extrinsic evidence. As MyPAQ explained in its Patent Owner Response, this construction is consistent with the ordinary understanding at the time of invention: Chapter 6 titled "Monolithically Integrated Circuits" of the textbook "Semiconductor Devices" by Morris defines a "monolithic integrated circuit" as "a complete circuit or group of circuits *manufactured in a single piece of silicon*... The word monolithic is derived from the two Greek words 'monos' and 'lithos,' meaning single and stone, respectively. *The word 'monolithic' implies that **the circuit is manufactured within a single crystal**.*" Appx1549 [Ex. 2023] (emphasis added). Additionally, the textbook "Methods of Experimental Physics" by Bleuler states that a circuit built on a single wafer of silicon—"*a circuit, **fabricated in a single silicon chip**, is called a monolithic integrated circuit*." Appx1553 [Ex. 2024] (emphasis added). MyPAQ's expert opined that the texts available at the time of invention would inform the person of ordinary skill that "monolithically integrated" would have the meaning of the agreed construction—"fabricated from a single piece of semiconductor material." Appx1482-1484 [Ferrese Decl.]; *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382-83 (Fed.

11

Cir. 2008) (permitting the factfinder to "look to extrinsic evidence so long as the

extrinsic evidence does not contradict the meaning otherwise apparent from the

intrinsic record."). Samsung presented no evidence to the contrary.

The extrinsic evidence provided by MyPAQ is consistent with the intrinsic

evidence. For example, Figure 3 of the '399 Patent and its accompanying

description show and describe four diodes monolithically integrated on a single

chip—that is, the chip containing the four diodes is fabricated from a single piece

of silicon:



Appx49 ['399 Patent]; Appx1483 [Ferrese Decl.] (("Based on Fig. 3 and the

description of a single silicon die, a person of skill would understand that a single

silicon die comprises a single piece of silicon."). The '399 Patent further states

that the fabrication process is monolithic by use of the SOI (silicon-on-insulator)

technology to realize the additional active components ("the four diodes") in a

single piece of fabricated silicon ("a single die"): "In SOI technology, one can realise the four diodes in a single die, so that the additional space requirements for the areas on the leadframe, including the insulation gaps in between, are dropped." Appx53 ['399 Patent]. "By using a monolithically integrated element for the bridge rectifier 106, it is possible to reduce the required area from about 20 mm$^2$ to about 12 mm$^2$." Appx53 ['399 Patent]. Thus, the '399 Patent consistently describes "monolithically integrated" in a manner that a person of ordinary skill would understand to mean a fabrication process originating from a single piece of semiconductor material. Appx301-304 [Patent Owner Response]; Appx1482-1484 [Ferrese Decl.].

Finally, this understanding is confirmed by the explicit language of claim 10. Appx303 [Patent Owner Response]; Appx366-367 [Sur-reply]. Claim 10 positively recites two separate elements: (1) the active components are "combined into a single semiconductor chip" and (2) the active components are "monolithically integrated." Because claim 10 separately recites ***both*** that the active components are "combined into a single semiconductor chip" ***and*** that the active components are "monolithically integrated," the doctrine of claim differentiation presumes that the definition of "monolithically integrated" must be distinct from the components simply being on "a single semiconductor chip." *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)

13

("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1305 (Fed. Cir. 2014). The parties' agreed construction is thus correct for the additional reason that "monolithically integrated" is properly distinguished from the first element of claim 10, "combined into a single semiconductor chip." Appx303 [Patent Owner Response]; Appx366-367 [Sur-reply].

Accordingly, the Board should have applied the parties' agreed construction of "monolithically integrated"—that is, "fabricated from a single piece of semiconductor material"—in its analysis of the prior art.

### B. The Board's Final Decision Purported to Adopt the Parties' Agreed, Correct Construction of "Monolithically Integrated" but Implicitly Applied a Different, Incorrect Construction

In view of the overwhelming evidence, the Final Decision purported to adopt the agreed, correct construction of "monolithically integrated" as meaning "fabricated from a single piece of semiconductor material." Appx13 [Final Decision] ("[W]e apply the parties' proposed joint construction of 'monolithically integrated' as 'fabricated from a single piece of semiconductor material.'").

Nevertheless, when analyzing the prior art, the Board implicitly used a different, incorrect construction of "monolithically integrated" to determine that claim 10 was taught. Thus, this case is controlled by *Linear Technology v. Int'l Trade Comm'n,* 566 F.3d

1049, 1060 (Fed. Cir. 2009). There, this Court held that the fact finder implicitly construed a claim limitation while analyzing whether a disclosure met the limitation. The Court reversed because the implicit claim construction was incorrect.

The same holds true here. The Board's implicit claim construction did not limit "monolithically integrated" to "***fabricated from*** a single piece of semiconductor material" as correctly construed. Rather, the Board's implicit construction was broader and improperly encompassed merely being "***on*** a single semiconductor chip."

The Board's Final Decision did not find that any prior art chip's fabrication process begins from a single piece of semiconductor material—i.e., "***fabricated from*** a single piece of semiconductor material." Nor could it, because, as explained below, no substantial evidence exists to support such a finding (as even Samsung's expert admitted). Instead, the Board simply determined that the prior art taught circuits "***on*** a single piece of semiconductor material" and concluded that a teaching of circuits on a single piece of semiconductor material was sufficient to teach "monolithically integrated." Appx35-43 [Final Decision].

For example, with respect to Zverev, the Final Decision states that:

> Petitioner persuasively argues that Zverev's 'cell array' refers to a 'plurality of single transistors' 'connected with their load paths and control terminals in parallel to each other,' as described in Zverev, and, therefore, '***on*** a single piece of semiconductor material.' We

15

credit Petitioner's expert's reasoning and testimony that, to accomplish Zverev's configuration of transistors in the same cell array, 'these transistors must be ***on*** the same piece of semiconductor material.'

Appx39 [Final Decision] (emphasis added). The Board's entire analysis is directed to whether the fabrication ***results*** in circuits on a single piece of semiconductor material but never addresses whether the fabrication is ***from*** a single piece of semiconductor material:

On this point, we credit Petitioner's expert: the 'plain and ordinary meaning' of Zverev's 'integrated on a single semiconductor chip' language 'is that ***there is one piece of semiconductor material (i.e. chip, die) that has the switching transistor, supply device, and/or the sense MOSFET*** fabricated as an integrated circuit.

Appx38 [Final Decision] (emphasis added). As a result, the Board concluded that Zverev taught the "monolithically integrated" element simply because Zverev's transistors were on a single chip. *See Linear,* 566 F.3d at 1060.

The same error infects the Board's analysis of Liaw. As with Zverev, the Board concluded that Liaw taught the "monolithically integrated" element simply because Liaw's transistors are "***on*** a single chip":

We determine that Liaw's disclosure of how its active components are integrated ***on*** a single chip (i.e., die) teaches that Liaw's additional active components are monolithically integrated. We are persuaded by Petitioner's arguments explaining how the 'relevant circuitry of Liaw is monolithically integrated.' We credit Petitioner's expert's interpretation of Liaw: 'The only reason for Liaw to state that [the JFET and power MOS transistor] are fabricated in a 'compatible' semiconductor 'process' is so that they can be integrated ***on*** a single chip (die).'

Appx42 [Final Decision] (emphasis added). Again, the Board concluded that Liaw

taught "monolithically integrated" because its components are "***on*** a single chip."

*Id*.; *see Linear,* 566 F.3d at 1060.

While the Final Decision extensively discussed how the prior art teaches

components ***on*** a single chip, it never addressed whether the prior art teaches a

fabrication process that originates from a single piece of semiconductor

material—i.e., "***fabricated from*** a single piece of semiconductor material."

Appx35-43 [Final Decision]. This distinction is critical because, as MyPAQ's

expert Dr. Ferrese explained, a person of skill in the art would be aware that a

single semiconductor chip could be fabricated from multiple pieces of

semiconductor material (such as hybrid integrated circuits) such that a fabrication

process that results in a circuit on a single chip may not be "monolithically

integrated":

> While Zverev describes CH1 as 'integrated,' this is different than
> 'monolithically integrated.' For example, a person of skill in the art
> would understand that integrated circuits also encompass hybrid
> integrated circuits which are fabricated from more than one piece of
> silicon and are not monolithically integrated. Zverev contains no
> disclosure as to whether chip CH1 is fabricated from a single piece of
> silicon or 'monolithically integrated' as a person of skill in the art
> would understand the term… [D]isclosure of a single semiconductor
> chip—even a single integrated semiconductor chip—does not suggest
> to a person of skill in the art that the semiconductor chip is
> monolithically integrated, as opposed to, for example, hybrid
> integrated.

Appx1495-1496 [Ferrese Declaration] (internal citations omitted); *see also*

Appx365-369 [Sur-Reply]; Appx311-314 [Patent Owner Response]. The

unrebutted evidence shows that whether a circuit is on a single chip is not

determinative of whether that circuit is fabricated from a single piece of

semiconductor material as required by the agreed, correct construction of

"monolithically integrated." Appx432, Appx417-423 [Hearing Transcript]. The

Board's Final Decision, by jettisoning the "fabricated from" element of the

agreed, correct construction of "monolithically integrated" and substituting its

erroneous construction without this element, fails to address this issue at all.

Appx35-43 [Final Decision]; *Qualcomm*, 6 F. 4th at 1263 (holding that it is

unreasonable for the Board to treat an agreed-upon claim construction as a

"moving target.").

    For these reasons, the Board's implicit construction is clear legal error

unsupported by any evidence of record and directly contradicts both the intrinsic and

extrinsic evidence. Accordingly, upon *de novo* review, this Court should reverse the

Board's implicit construction and construe "monolithically integrated" the same way

that the parties did: "fabricated from a single piece of semiconductor material."

## III.  THE PRIOR ART FAILS TO DISCLOSE "MONOLITHICALLY INTEGRATED" UNDER THE AGREED, CORRECT CONSTRUCTION

None of the prior art teaches active components that are "*fabricated* from a single piece of semiconductor material" as required by the parties' agreed construction. Appx365-369 [Sur-Reply]. Indeed, Samsung's expert Mr. Elenius explicitly confirmed in deposition that Zverev does not disclose a fabrication process for its chips:

> Q. Besides the structure shown in Figure 4, does Zverev describe how chip CH1 is fabricated?
>
> A. Are you asking if the -- do they give the details of the diffusion processes and lithography and doping and everything?
>
> Q. Yes[.] Did they give any details on the lithography?
>
> A. No, they did not.

Appx1523 [Elenius Deposition Transcript]. Likewise, it is similarly unchallenged that Liaw does not disclose a fabrication process for its chips. Appx1496 [Ferrese Decl.]; Appx365-369 [Sur-Reply]; Appx313-314 [Patent Owner Response]. Samsung failed to present any credible evidence in the below proceeding that either the Zverev or Liaw prior art *fabricated* a semiconductor chip from a single piece of semiconductor material as required by the agreed, correct construction. Appx365-369 [Sur-Reply]; *In re Magnum Oil Tools International, Ltd.*, 829 F. 3d 1364, 1377-78 (Fed. Cir. 2016) (Petitioner bears the burden of providing evidence to show unpatentability, which never shifts to patent owner). Without a disclosed

fabrication process, neither Zverev nor Liaw can teach active components "***fabricated from*** a single piece of semiconductor material."

Given the lack of the necessary disclosure from Samsung's prior art, Samsung instead argued below that the prior art showed active components "***on*** a single chip." Appx365-369 [Sur-Reply]. The section of its Petitioner's Reply concerning Zverev is titled "Zverev discloses circuitry ***on*** a single piece of semiconductor material" and explains why Zverev discloses that its components "are ***on*** a single piece of semiconductor material."[2] Appx352-353 [Petitioner's Reply] ("Thus, they are ***on*** a single piece of semiconductor material.") (emphasis added). Similarly, Samsung's section discussing its arguments for Liaw is titled "Liaw discloses circuitry ***on*** a single piece of semiconductor material" and explains why "one 'chip' of Liaw (i.e., one die) ***individually contains*** all the claimed components of claim 10." Appx356 [Petitioner's Reply] (emphasis added).

---

[2] To the extent Samsung relies on the Reply Declaration of its expert for the proposition that Zverev's transistors are fabricated from the same piece of semiconductor material, Mr. Elenius's testimony is both conclusory and lacks credibility because it contradicts his sworn trial testimony that Zverev does ***not*** disclose any fabrication process. *The Johns Hopkins University v. Datascope Corp.*, 543 F.3d 1342, 1349 (Fed. Cir. 2008) (holding that an expert's "contradictory testimony" did not constitute substantial evidence to support a judgment).

But as explained above, Samsung's arguments and evidence are directed to the wrong construction of "monolithically integrated." Evidence that components are *on* a single chip—the *end result* of the fabrication process—is not evidence that the components are *fabricated from* a single piece of semiconductor material—the *input* of the fabrication process. Appx365-369 [Sur-Reply]; Appx432, Appx417-423 [Hearing Transcript]. Even if Samsung has shown that Zverev shows its transistors are arranged "literally right next to each other" on a chip, that is insufficient to meet the correct construction of "monolithically integrated" because, as explained above, the unrebutted evidence shows that fabrication processes from multiple pieces of semiconductor material may result in the components being on a single semiconductor chip. *Compare* Appx354 [Petitioner's Reply] *with* Appx365-369 [Sur-reply].

Indeed, the requirement that the components are "on a single chip" is already separately claimed by the first half of claim 10: "the additional active components (106, 108, 110) are at least partially *combined into a single semiconductor chip*." As explained above, because claim 10 separately requires the active components *both* to be on a single chip *and* "monolithically integrated," disclosure of components on a single chip or die alone is necessary but insufficient to meet claim 10. This is the only reading consistent with this Court's extensive precedent that every word of a claim must be given effect. *See Pause*

*Technology LLC v. TiVo Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("In construing claims[,] we must give each claim term the respect that it is due."); *Apple*, 757 F.3d at 1305. If the applicant intended for claim 10 to be broadly read to encompass all circuits on a single semiconductor chip—without any additional meaning to the term "monolithically integrated"—it could have done so simply by reciting the first half of claim 10 and omitting the additional "monolithically integrated" language. But by separately reciting "monolithically integrated" in addition to a "single semiconductor chip," the applicant explicitly expressed its intent that the single semiconductor chip must further be fabricated from a single piece of semiconductor material.

To satisfy the second half of claim 10 under the correct construction of "monolithically integrated," Samsung must show that the chip itself is "fabricated from a single piece of semiconductor material" Appx311-314 [Patent Owner Response]. But as explained above, no substantial evidence exists to suggest any prior art chip's fabrication process begins from a single piece of semiconductor material—i.e., "fabricated from a single piece of semiconductor material." For these reasons, MyPAQ conclusively showed that the prior art did not disclose active components "fabricated from a single piece of semiconductor material" as required by the parties' agreed, correct construction of "monolithically integrated." The Board could only find that the prior art taught "monolithically

integrated" by implicitly jettisoning the correct construction agreed to by the parties and *sua sponte* substituting its own, incorrect construction in the Final Decision. By doing so, the Board committed legal error and the Final Decision must be reversed.

## IV.    CONCLUSION

For the reasons set forth above, the Board's Final Written Decision must be reversed.

September 22, 2023                    Respectfully submitted,


                                      */s/ Minghui Yang*
                                      James T. Carmichael
                                      Stephen P. McBride
                                      Minghui Yang
                                      CARMICHAEL IP, PLLC
                                      8607 Westwood Center Drive, Suite 270
                                      Tysons, VA 22182
                                      (703) 646-9255
                                      jim@carmichaelip.com
                                      stevemcbride@carmichaelip.com
                                      mitch@carmichaelip.com

                                      *Counsel for Appellant MyPAQ Holding Ltd.*

# **ADDENDUM**

Trials@uspto.gov                                              Paper 25
571-272-7822                                        Entered: May 15, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

MYPAQ HOLDINGS LTD.,
Patent Owner.

———————————

IPR2022-00307
Patent 7,403,399 B2

———————————

Before KRISTINA M. KALAN, DANIEL J. GALLIGAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00307
Patent 7,403,399 B2

## I.    INTRODUCTION

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–6, 10, and 13 of U.S. Patent No. 7,403,399 B2 (Ex. 1001, "the '399 patent"). MyPAQ Holdings Ltd. ("Patent Owner") filed a Preliminary Response. Paper 6. Pursuant to Board authorization, Petitioner filed a Reply to the Patent Owner Preliminary Response. Paper 8. Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 9.

We instituted *inter partes* review of claims 1–6, 10, and 13 of the '399 patent on the grounds of unpatentability alleged in the Petition. Paper 10 ("Dec."). After institution of trial, Patent Owner filed a Patent Owner Response. Paper 15 ("PO Resp."). On August 29, 2022, the same day Patent Owner filed its Response, Patent Owner also filed a Statutory Disclaimer of claims 1–5 and 13 of the '399 patent, leaving only claims 6 and 10 at issue in this *inter partes* review. Ex. 2019; PO Resp. 1. Petitioner filed a Reply. Paper 18 ("Reply"). Patent Owner filed a Sur-Reply. Paper 19 ("Sur-Reply"). We held an oral hearing on February 23, 2023, and a transcript of the hearing is included in the record. Paper 24 ("Tr.").

This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 6 and 10, the only claims remaining in this *inter partes* review, are unpatentable.

### A.    Related Proceedings

The parties identify the following district court litigation as a related matter: *MyPAQ Holdings Ltd. v. Samsung Electronics Co.,* No. 6:21-CV-

2

IPR2022-00307
Patent 7,403,399 B2

00398 (W.D. Tex.).  Pet. 1; Paper 7, 1 (Patent Owner's updated mandatory notices).

The parties also state that Petitioner has filed petitions regarding other patents held by Patent Owner:  IPR2022-00308 regarding U.S. Pat. No. 7,978,489, IPR2022-00311 regarding U.S. Pat. No. 8,477,514, and IPR2022-00312 regarding U.S. Pat. No. 7,675,759.  Pet. 1; Paper 7, 1.

B.    *Real Parties-in-Interest*

Petitioner identifies Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, LLC as the real parties-in-interest.  Pet. 1.  Patent Owner states that the "real party in interest is:  MyPAQ Holdings Ltd." and that "Transpacific IP Group Limited has an ownership interest in MyPAQ."  Paper 7, 1.

C.    *The '399 Patent*

The '399 patent is titled "Active Primary-Sided Circuit Arrangement for a Switch-Mode Power Supply" and is directed to a circuit arrangement that has various components integrated in at least one additional semiconductor chip.  Ex. 1001, codes (54), (57).  By way of background, the '399 patent explains that "[c]harging devices in the low power range are normally implemented as switch-mode power supplies."  *Id.* at 1:19–20. The '399 patent's "switch-mode power supply has a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer."  *Id.* at 1:8–12.

The '399 patent focuses on the arrangement of the components on the primary side of the switch-mode power supply.  *See id.* at 2:40–49.  Figure 1 is reproduced below.

3

IPR2022-00307
Patent 7,403,399 B2



*FIG. 1*

Figure 1, "in the form of a wiring diagram, shows the circuit diagram of the primary side of a switch-mode power supply with primary regulation." *Id.* at 1:31–33. Figure 1 shows various components, including converter-transformer 120 (which includes primary-sided winding 122 and auxiliary winding 124), active components, and passive components. *Id.* at 1:30–39. Passive components include "resistors, inductors and capacitors." *Id.* at 1:36–38. Active components "comprise four single diodes, which form a bridge rectifier 106, the switching transistor 102, an ASIC for pulse width modulation of the primary-sided switching transistor as control circuit 104 of the primary-sided switch 102, an auxiliary voltage diode 108 and a snubber diode 110." *Id.* at 1:38–44.

The '399 patent arranges components of the primary-sided circuit such that "the control circuit is formed by a first integrated semiconductor chip and that the primary-sided switch and the additional components are

4

IPR2022-00307
Patent 7,403,399 B2

integrated in at least one additional semiconductor chip being separate from the control circuit and arranged on a circuit carrier shared with the control circuit." *Id.* at 2:48–50. The '399 patent states that, because the active components "are not executed in a discrete construction . . . but are instead assembled on a shared circuit carrier and, according to an advantageous further development, accommodated in a shared IC housing," there is "a considerable decrease in the space requirement, as well as a reduction of possible error sources." *Id.* at 2:58–65.

Figure 2 is reproduced below.



**FIG. 2**

Figure 2 shows "an active primary-sided circuit arrangement" on a circuit carrier. *Id.* at 4:21–23. In Figure 2, "switching transistor 102, the control circuit 104 (also identified as the control IC), as well as the snubber diode 110, the diodes for the bridge rectifier 106 and the diode for the auxiliary power supply 108 are initially present as separate semiconductor chips, also called dies." *Id.* at 4:59–64. The "individual semiconductor elements are glued or soldered to the respective areas of the leadframe 112," i.e., an exemplary circuit carrier, and are "appropriately contacted using bonding wires 114." *Id.* at 4:43–47, 4:64–66. The semiconductor chips are

5

IPR2022-00307
Patent 7,403,399 B2

contacted to outer terminals 116 via bonding wires 114. *Id.* at 4:66–5:3.
Additionally, shared housing 118 may be "die-cast around the arrangement"
using a casting compound such as an epoxy resin. *Id.* at 4:52–54.

    *D.   Illustrative Claim*

    Independent claim 1 (now disclaimed) and its dependent claims 6
and 10 are reproduced below.

> 1[pre] Circuit arrangement for a switch-mode power supply,
> wherein the switch-mode power supply has a primary side, which
> can be connected to a supply voltage, and a secondary side,
> which can be connected to a consumer,
>> 1[a] wherein the circuit arrangement (100) comprises a
>> primary-sided switch (102), a control circuit (104) for
>> controlling the primary-sided switch (102) and additional
>> active, primary-sided components (106, 108, 110),
>> 1[b] wherein said control circuit (104) is formed by a first
>> integrated semiconductor chip and the primary-sided switch
>> (102) and the additional components (106, 108, 110), are
>> integrated in at least one additional semiconductor chip,
>> 1[c] said semiconductor chip being separate from the control
>> circuit and arranged on a circuit carrier (112) shared with
>> the control circuit.

Ex. 1001, 6:23–41 (bracketed designations and formatting added by
Petitioner (Pet. 25–31)).

> 6.   Circuit arrangement according to claim 1, wherein a
> metallization of the circuit carrier (112) has cooling areas that are
> formed for removing heat.

*Id.* at 6:49–51.

> 10.   Circuit arrangement according to claim 1, wherein the
> additional active components (106, 108, 110) are at least
> partially combined into a single semiconductor chip and are
> monolithically integrated.

*Id.* at 6:62–65.

6

Appx6

IPR2022-00307
Patent 7,403,399 B2

### E.    *Instituted Grounds of Unpatentability*

We instituted *inter partes* review of claims of the '399 patent on the
following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–3, 5, 10, 13 | § 102[1] | Zverev[2] |
| 4, 6 | § 103 | Zverev, Shiraishi[3] |
| 4, 6 | § 103 | Zverev, Lacap[4] |
| 1–6, 10, 13 | § 103 | Liaw,[5] Nam[6] |
| 1–5, 10, 13 | § 103 | Liaw, Lin[7] |
| 6 | § 103 | Liaw, Lin, Shiraishi |

Following the disclaimer, the claims and grounds identified in the table
below remain in the proceeding:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 10 | § 102 | Zverev |
| 6 | § 103 | Zverev, Shiraishi |
| 6 | § 103 | Zverev, Lacap |
| 6, 10 | § 103 | Liaw, Nam |
| 10 | § 103 | Liaw, Lin |
| 6 | § 103 | Liaw, Lin, Shiraishi |

---

[1]  The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103.  Because the '399
patent has an effective filing date prior to the effective date of the applicable
AIA amendments, we refer to the pre-AIA versions of §§ 102 and 103.
[2]  DE 100 43 485 A1, published March 14, 2002 (Ex. 1003).  Exhibit 1003
includes a copy of the original document and a certified translation.
Ex. 1003, 21; *see* Pet. iv.
[3]  US 2004/0227547 A1, published November 18, 2004 (Ex. 1007).
[4]  US 5,939,781, issued August 17, 1999 (Ex. 1008).
[5]  US 6,259,618 B1, issued July 10, 2001 (Ex. 1004).
[6]  US 2003/0102489 A1, published June 5, 2003 (Ex. 1005).
[7]  US 5,491,360, issued February 13, 1996 (Ex. 1006).

Appx7

IPR2022-00307
Patent 7,403,399 B2

In support of its unpatentability arguments, Petitioner relies on the
declarations of Peter Elenius.  Ex. 1002; Ex. 1035.  Patent Owner relies on
the declaration of Dr. Frank Ferrese to support its opposition.  Ex. 2020.[8]
The parties also rely on the deposition transcripts of Mr. Elenius (Ex. 2022)
and Dr. Ferrese (Ex. 1036).

## II.   ANALYSIS

### A.   Legal Standards

"A claim is anticipated only if each and every element as set forth in
the claim is found, either expressly or inherently described, in a single prior
art reference."  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628,
631 (Fed. Cir. 1987).  A "prior art reference—in order to anticipate under
35 U.S.C. § 102—must not only disclose all elements of the claim within the
four corners of the document, but must also disclose those elements
'arranged as in the claim.'"  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d
1359, 1369 (Fed. Cir. 2008) (quoting *Connell v. Sears, Roebuck & Co.*, 722
F.2d 1542, 1548 (Fed. Cir. 1983)).  Although the elements must be arranged
or combined in the same way as in the claim, "the reference need not satisfy
an *ipsissimis verbis* test," i.e., identity of terminology is not required.  *In re
Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences
between the subject matter sought to be patented and the prior art are such

---

[8] Petitioner argues that Dr. Ferrese's opinions should be given little, if any,
weight.  Reply 3.  Patent Owner responds that Dr. Ferrese's opinions are
entitled to significant weight.  Sur-Reply 2–4.  We acknowledge these
arguments and, in our analysis, accord Dr. Ferrese's declaration and
testimony the appropriate weight.

Appx8

IPR2022-00307
Patent 7,403,399 B2

that the subject matter as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Obviousness is resolved based on underlying factual determinations, including: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness, i.e., secondary considerations.[9] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A decision on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418.

Petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). Petitioner must demonstrate unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d); *see also Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

---

[9] Neither Patent Owner nor Petitioner appear to present any evidence directed to secondary considerations. *See* Pet.; PO Resp.; Reply; Sur-Reply.

9

Appx9

IPR2022-00307
Patent 7,403,399 B2

*B.    Level of Ordinary Skill in the Art*

In our Institution Decision, we adopted Petitioner's undisputed contention that a person of ordinary skill in the art "would have either (i) a Master of Science in Electrical Engineering, Mechanical Engineering or a related field, or (ii) a Bachelor of Science in Electrical Engineering, Mechanical Engineering or a related field as well as at least two years of experience in the design and/or packaging of power electronics" (Pet. 18 (citing Ex. 1002 ¶ 99)), with the exception of the open-ended phrase "at least," which expands the range of experience indefinitely without an upper bound.  Dec. 8–9.

Patent Owner contends that it "does not dispute part (ii) of the Petition's definition is sufficient for a POSITA, however for part (i), a Master of Science in Mechanical Engineering alone would not necessarily focus enough on power electronics to qualify as a POSITA."  PO Resp. 13 (citing Ex. 2020 ¶¶ 39–40).

In its Reply, Petitioner agrees with using "the vantage point of a person with expertise in the design and/or packaging of power electronics (through work or otherwise) in addition to either a Bachelor's or Master's degree in a relevant field."  Reply 2.

Patent Owner, in its Sur-Reply, notes Petitioner's agreement that "a POSITA should have expertise in power electronics design or packaging" and argues that the definition should incorporate "the requisite expertise in power electronics design or packaging."  Sur-Reply 2.

We are reluctant to use the parties' formulation requiring "expertise" in power electronics because it could be read to include an expert level of skill rather than an ordinary level of skill.  Accordingly, we modify the

IPR2022-00307
Patent 7,403,399 B2

definition set forth in the Institution Decision, so that a person of ordinary skill in the art would have either (i) a Master of Science in Electrical Engineering, Mechanical Engineering or a related field, and experience in the design and/or packaging of power electronics, or (ii) a Bachelor of Science in Electrical Engineering, Mechanical Engineering or a related field as well as two years of experience in the design and/or packaging of power electronics. We further note that the prior art itself demonstrates the level of skill in the art at the time of the invention. *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that "specific findings on the level of skill in the art . . . [are not required] 'where the prior art itself reflects an appropriate level and a need for testimony is not shown'" (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985))).

*C.    Claim Construction*

We apply the claim construction standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b). Under *Phillips*, claim terms are afforded "their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. Only terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

In the Petition, Petitioner proposes constructions for two limitations. *See* Pet. 18–21. First, Petitioner proposes that the limitation "active . . . components," as recited in claims 1 and 13, be construed as "non-passive

11

Appx11

IPR2022-00307
Patent 7,403,399 B2

components including transistors, diodes, and integrated circuits (ICs) for pulse width modulation." *Id.* at 19. Second, Petitioner proposes that the limitation "wired housing," as recited in claim 3, be construed as "housing compatible with conventional through-hole technology." *Id.* at 20. We determined in the Institution Decision that no claim term required express construction. Dec. 8.

In the Response, Patent Owner proposes that the term "monolithically integrated" in claim 10 be construed as "fabricated from a single piece of silicon." PO Resp. 10. Patent Owner relies on textbook definitions, testimony, and intrinsic evidence to support its proposed interpretation. *Id.* at 10–11 (relying on Ex. 2020 ¶¶ 44–47; Ex. 2023, 1; Ex. 2024, 3; Ex. 1001, 3:41–45, 5:39–44, 3:67–4:3, 5:47–50, Fig. 3). Patent Owner argues that, based on the '399 patent's "Fig. 3 and the description of a single silicon die, a person of skill would understand that a single silicon die comprises a single piece of silicon." *Id.* at 12 (citing Ex. 2020 ¶ 45).

Petitioner proposes that the term "monolithically integrated" means "fabricated from a single piece of semiconductor material (such as silicon)." Reply 16. Petitioner relies on its own expert's testimony (Ex. 1035 ¶ 6), Patent Owner's expert's testimony (Ex. 1036, 16:14–22), and a dictionary definition (Ex. 1037, 483) to support its proposed construction. *Id.* at 16–17.

Patent Owner agrees that "the Board should adopt the construction of 'monolithically integrated' as 'fabricated from a single piece of semiconductor material.'" Sur-Reply 2.

We note the '399 patent's example of monolithic integration: Figure 3 shows a "monolithically integrated bridge rectifier" (Ex. 1001, 4:24–25), also referred to as "integrated bridge rectifier circuit 106" (*id.*

12

IPR2022-00307
Patent 7,403,399 B2

at 5:36–37) in which "[i]nstead of the four individual diode chips shown in FIG. 2, all four diodes are integrated on one die in silicon-on-insulator (SOI) technology" such that "a compact construction of the individual constituents of the circuit results from the monolithic integration." *Id.* at 5:38–44. This contrasts with the "embodiment shown in FIG. 2," in which "the diodes for the bridge rectifier 106" are "initially present as separate semiconductor chips, also called dies." *Id.* at 4:61–64. As quoted by Patent Owner: "In SOI technology, one can realise the four diodes in a single die, so that the additional space requirements for the areas on the leadframe, including the insulation gaps in between, are dropped." *Id.* at 3:67–4:3 (quoted in PO Resp. 12).

In view of the agreement between the parties, we apply the parties' proposed joint construction of "monolithically integrated" as "fabricated from a single piece of semiconductor material." We determine that no other claim term requires express construction. *See Vivid Techs.*, 200 F.3d at 803.

D.   *Summary of Certain Asserted Art*

1.   *Zverev*

Zverev is a German patent application publication titled "Switched-Mode Power Supply" and describes the arrangement of "a rectifier arrangement, a switching transistor and a control circuit for controlling the switching transistor." Ex. 1003, codes (54), (57). Zverev explains that its switched-mode power supply "suppl[ies] DC voltage to a load connected downstream of the switched-mode power supply." *Id.* ¶ 35. Figure 2 of Zverev is reproduced below.

13

IPR2022-00307
Patent 7,403,399 B2

FIG 2



Figure 2 is a circuit diagram of Zverev's switched-mode power supply. *Id.* ¶ 30. As shown in Figure 2, the "switched-mode power supply has a controllable semiconductor switch T1" which opens or closes to control the application of "supply voltage V to a primary coil L1 of a transformer TR." *Id.* ¶ 36. "A control circuit AS is provided for controlling the semiconductor switch T1." *Id.* ¶ 39.

Also shown in Figure 2, "another controllable semiconductor switch T2 is provided." *Id.* ¶ 42. Semiconductor switch T2 can "supply the control circuit AS with the supply current I2 or supply potential V2 required for standby operation" and can "supply power to the control circuit during normal operation." *Id.* ¶ 44. Charge pump LP "controls the semiconductor switch T2." *Id.* ¶ 43.

Additionally, "sense MOSFET T3 can be interconnected with the power transistor T1" (not shown in Figure 2). *Id.* ¶ 48. A sense MOSFET "generates a current measurement signal which is fed to the evaluation circuit" for power management, e.g., a power-saving standby operating

14

IPR2022-00307
Patent 7,403,399 B2

mode or a normal operating mode. *Id.* ¶¶ 17, 41. Sense MOSFET T3 "measures the current (11 [sic]) through the switching transistor (T1)." *Id.* claim 6 (bracketing in provided translation).

Furthermore, Zverev explains that various components of its switched-mode power supply can be integrated on various semiconductor chips. *See id.* ¶¶ 18, 47, 50. In particular, "charge pump LP and the control circuit AS are integrated . . . on a first semiconductor chip CH2" while "MOSFETs T1, T2, T3 are integrated on a second semiconductor chip CH1." *Id.* ¶ 50; *see id.* Figs. 2, 4. Zverev states that "two semiconductor chips CH1, CH2 can then be interconnected with each other externally and can advantageously be arranged on a single or also several lead frames LF." *Id.* ¶ 50. "The lead frame(s) LF can then be fitted in a single package G together with the two semiconductor chips CH1, CH2." *Id.*

    *2. Lacap*

Lacap is a US patent titled "Thermally Enhanced Integrated Circuit Packaging System" and is directed to "increased heat dissipation" for integrated circuit packages. Ex. 1008, codes (54), (57). In one embodiment, Lacap's "thermally enhanced integrated package" is "used with a 64-pin Thin Quad Flatpack Package (TQFP)." *Id.* at 4:55–58. Figure 10 of Lacap is reproduced below.

15

IPR2022-00307
Patent 7,403,399 B2

*FIG. 10*



Figure 10 of Lacap is a top cross-sectional view of an integrated circuit package. *Id.* at 4:32–35. Figure 10 "illustrates the enhanced thermal pathway from an integrated circuit die to web 920" which "provides increased heat transfer from the integrated circuit die to pins 930." *Id.* at 5:21–25; *see id.* at 4:60–67. In particular, "a wide heat transfer channel 1020 thermally connects pins 930 to die pad 1000." *Id.* at 5:27–29. "[H]eat transfer channel 1020 is typically made of a metal conductor, such as a copper alloy" and "forms a thermally conductive path between die pad 1000 and the top of pins 930." *Id.* at 5:43–47. "The combination of heat transfer channel 1020 and web 920 provides significantly greater heat dissipation from die 900 to the ambient environment than standard packages, without increasing package size and cost." *Id.* at 5:47–50.

   *3. Liaw*

   Liaw is a US patent titled "Power Chip Set for a Switching Mode Power Supply Having a Device for Providing a Drive Signal to a Control Unit Upon Startup" and is directed to "an integrated circuit (IC) of a

16

IPR2022-00307
Patent 7,403,399 B2

switching mode power supply (SMPS), and more particularly to a power
chip set for an SMPS." Ex. 1004, code (54), 1:7–9. By way of background,
Liaw explains that a power supply circuit "accepts an AC power" and
transforms the power input using various circuit components, e.g.,
transformers, capacitors, windings, resistors, pulse width modulators, and
regulators, so that ultimately, "a power supply output voltage is provided."
*Id.* at 1:20–35; *see id.* Fig. 1.

Liaw explains that its "power module 56 for a SMPS comprises a chip
set composed of a control unit chip 58 and a high voltage chip 60." *Id.*
at 2:41–44. Liaw states that "high voltage chip 60 contains high voltage
circuit elements, while all control circuits contained in the control unit
chip 58 being not applied with high voltage." *Id.* at 2:44–47.



Fig.3

Figure 3 of Liaw is a circuit diagram of a high voltage chip. *Id.* at 2:34–35.
Figure 3 shows high voltage chip 60 "in which a power MOS transistor 74
serves as the switching transistor being turned on/off under the control of the

IPR2022-00307
Patent 7,403,399 B2

control signal outputted from the control unit 58." *Id.* at 3:14–17. High voltage chip 60 includes "junction FET 80 . . . used as the start up element for the control unit 58," "power MOS transistor 82 serv[ing] as a current sense transistor to detect the drain current of the transistor 74," and "Zener diode 84 for over voltage protection of the control unit 58." *Id.* at 3:21–39.

      *4.   Nam*

    Nam is a US patent publication titled "Power Device Having Multi-Chip Package Structure" and is directed to a device in which "the power device, a transistor, which is a switching device, and a control integrated circuit (IC) chip, which is a driving device, are mounted together in a package." Ex. 1005, codes (54), (57). Figure 4 of Nam is reproduced below.

FIG. 4



Figure 4 of Nam is a plan view for explaining a power device having a multi-chip package structure. *Id.* ¶ 24. As shown in Figure 4, "power device having a multi-chip package structure . . . includes a lead frame 100 having a chip pad 102, an inner lead 104, and an outer lead (not shown)." *Id.* ¶ 32. Figure 4 also shows "transistor chip 108, which is a switching

18

device, attached to the chip pad 102 of the lead frame 100 by a conductive adhesive 110." *Id.* Further, "control integrated circuit (IC) chip 112 . . . is attached on the chip pad 102 of the lead frame 100 by an insulating adhesive tape 114 at the side of the transistor chip 108." *Id.* The insulating adhesive tape "preserve[s] the insulation of the control IC chip 112 from the transistor chip 108." *Id.* ¶ 33. "In order to secure a sufficient insulation [to] withstand voltage, the size of the insulating adhesive tape 114 has to be larger than that of the control IC chip 112." *Id.* ¶ 35. Thus, "it is desirable that distance between the edge of control IC chip 112 and the edge of the insulating adhesive tape 114 is equal to or greater than 100 μm." *Id.* First gold wire 118 connects "a bond pad 116 of the transistor chip 108 to a bond pad 116 of the control IC chip 112" and second gold wire 120 connects "a bond pad 116 of the transistor chip 108 to a bond pad 116 of the control IC chip 112 to an inner lead 104 of the lead frame 100, respectively." *Id.* ¶ 32.

E. *Petitioner's Arguments as to Now-Disclaimed Claim 1 – Zverev (Ground 1A)*

Petitioner asserts that every element of disclaimed claim 1 is found in Zverev, as set forth in the Petition as follows:

1[pre] *Circuit arrangement for a switch-mode power supply, wherein the switch-mode power supply has a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer,* (Pet. 25–26 (relying on Ex. 1002 ¶¶ 129–132; Ex. 1003 ¶¶ 1–2, 30, 35–37, 39, 41, 51–52, Fig. 2, claim 1)),[10]

---

[10] We express no opinion on whether the preamble is limiting.

IPR2022-00307
Patent 7,403,399 B2

1[a] *wherein the circuit arrangement (100) comprises a primary-sided switch (102), a control circuit (104) for controlling the primary-sided switch (102) and additional active, primary-sided components (106, 108, 110),* (Pet. 26–28 (relying on Ex. 1002 ¶¶ 133–135; Ex. 1003 ¶¶ 11–14, 16–18, 20–21, 32, 36–37, 39–45, 47–50, Figs. 2–4, claims 1–2, 6–8, 14)),

1[b] *wherein said control circuit (104) is formed by a first integrated semiconductor chip and the primary-sided switch (102) and the additional components (106, 108, 110), are integrated in at least one additional semiconductor chip,* (Pet. 28–30 (relying on Ex. 1002 ¶¶ 136–138; Ex. 1003 ¶¶ 18, 20, 32, 47–50, Figs. 2, 4, claim 14)),

1[c] *said semiconductor chip being separate from the control circuit and arranged on a circuit carrier (112) shared with the control circuit* (Pet. 30–31 (relying on Ex. 1002 ¶¶ 139–140; Ex. 1003 ¶¶ 18, 33, 49–50, Fig. 5)).

Petitioner's contentions are reflected in its annotated version of Zverev's Figure 2, reproduced below.

IPR2022-00307
Patent 7,403,399 B2



Zverev's Figure 2 is a circuit diagram of a switched-mode power supply. Ex. 1003 ¶ 30. In the annotated version of Zverev's Figure 2, reproduced above, Petitioner identifies control circuit AS on chip CH2 as the claimed "control circuit" that "is formed by a first integrated semiconductor chip." Pet. 28–29. Petitioner identifies switch T1 as the claimed "primary-sided switch" and switch T2 and sense MOSFET T3 (annotation added by Petitioner) as the claimed "additional active, primary-sided components" and argues that T1, T2, and T3 "are integrated in at least one additional semiconductor chip," as recited in claim 1, because they are located on chip CH1, rather than chip CH2, which has control circuit AS. *Id.* at 27–29. Petitioner argues that all of these components are in the "primary side" of the power supply, as recited in claim 1, which is connected to supply voltage V. *Id.* at 25–26. Petitioner argues that the load RL is the claimed "consumer," to which the components including secondary coil L2 (the

21

IPR2022-00307
Patent 7,403,399 B2

claimed "secondary side") are attached to deliver power. *Id*. As to

limitation 1[c], Petitioner argues that chips CH1 and CH2 are separate chips

but can be arranged on the same lead frame (the claimed "circuit carrier").

*Id*. at 30–31; *see* Ex. 1003 ¶ 50 ("These two semiconductor chips CH1, CH2

can then be interconnected with each other externally and can

advantageously be arranged on a single or also several lead frames LF. The

lead frame(s) LF can then be fitted in a single package G together with the

two semiconductor chips CH1, CH2.").

In its Response, Patent Owner does not dispute these arguments. *See*

PO Resp. *passim.*

Based on Petitioner's contentions and evidence, summarized above,

we find that Zverev describes the subject matter of disclaimed claim 1.

> F. *Petitioner's Arguments as to Now-Disclaimed Claim 1 – Liaw
> and Nam (Ground 2)*

Petitioner asserts that every element of disclaimed claim 1 is found in

the combination of Liaw and Nam, as set forth in the Petition as follows:

1[pre] *Circuit arrangement for a switch-mode power supply, wherein

the switch-mode power supply has a primary side, which can be connected

to a supply voltage, and a secondary side, which can be connected to a

consumer,* (Pet. 54–56 (relying on Ex. 1002 ¶¶ 191–196; Ex. 1004, 1:7–9,

1:20–40, 2:41–3:39, Figs. 1–3)),

1[a] *wherein the circuit arrangement (100) comprises a primary-sided

switch (102), a control circuit (104) for controlling the primary-sided switch

(102) and additional active, primary-sided components (106, 108, 110),*

(Pet. 56–58 (relying on Ex. 1002 ¶¶ 197–200; Ex. 1004, 2:41–44, 2:48–63,

3:14–25, 3:32–38, Figs. 2, 3, claims 1, 3)),

22

IPR2022-00307
Patent 7,403,399 B2

1[b] *wherein said control circuit (104) is formed by a first integrated semiconductor chip and the primary-sided switch (102) and the additional components (106, 108, 110), are integrated in at least one additional semiconductor chip,* (Pet. 58–60 (relying on Ex. 1002 ¶¶ 201–203; Ex. 1004, 2:41–66, 3:14–4:16, Figs. 3, 4, claims 1, 3)),

1[c] *said semiconductor chip being separate from the control circuit and arranged on a circuit carrier (112) shared with the control circuit* (Pet. 60–62 (relying on Ex. 1002 ¶¶ 204–207; Ex. 1004, 2:16–21, 2:41–47, 3:14–39, 4:53–55, Figs. 2, 3, claims 1, 4; Ex. 1005 ¶¶ 3, 5, 11, 13, 32, 40, code (57), Figs. 4, 5, claims 1, 8)).

More particularly, Petitioner relies on Liaw to disclose all the limitations of claim 1 except for the requirement of the shared circuit carrier (limitation 1[c]), for which Petitioner relies on Nam. Pet. 50–61. Petitioner argues that it was "well known that multiple chips could be packaged together in a multi-chip package" and one of ordinary skill in the art would have been motivated to "combine the circuit arrangement disclosed by *Liaw* (i.e., the control unit chip and high-voltage chip) with the packaging disclosed by *Nam*." *Id.* at 51–52 (citing Ex. 1002 ¶¶ 93–97, 187, 189). More specifically, Petitioner argues that "a POSITA would have been motivated to arrange *Liaw*'s high-voltage chip 60 (including the switching transistor 74) and control unit chip 58 in the package disclosed by *Nam* in the same manner that *Nam* respectively arranges its transistor chip 108 and control integrated circuit (IC) chip 112." *Id.* at 53 (citing Ex. 1002 ¶190).

In its Response, Patent Owner does not dispute these arguments. *See* PO Resp. *passim.*

23

IPR2022-00307
Patent 7,403,399 B2

Based on Petitioner's contentions and evidence, summarized above, we find that the combination of Liaw and Nam teaches the subject matter of disclaimed claim 1 and that a person of ordinary skill in the art would have combined the teachings for the reasons given, with a reasonable expectation of success.

### G.   Claim 6 – Grounds 1B, 1C, 2, and 3B

Claim 6, which depends from disclaimed claim 1, additionally requires "wherein a metallization of the circuit carrier (112) has cooling areas that are formed for removing heat." Ex. 1001, 6:49–51. Petitioner argues that claim 6 would have been obvious over Zverev and Shiraishi (Ground 1B), Zverev and Lacap (Ground 1C), Liaw and Nam (Ground 2), and Liaw, Lin, and Shiraishi (Ground 3B). Patent Owner disagrees. PO Resp. 15–19.

#### 1.   Ground 1C (Zverev and Lacap)

Petitioner, relying on its Ground 1 arguments for Zverev alone to further argue that Zverev and Lacap would have rendered obvious claim 6, contends that Zverev's circuit carrier is lead frame LF. Pet. 48. "A POSITA would have understood that such a 'lead frame LF' disclosed by *Zverev* is formed of metal." *Id.* (citing Ex. 1002 ¶¶ 65–71, 178; Ex. 1010, 24; Ex. 1011, 21). Petitioner argues that one of ordinary skill in the art "would have been motivated to modify *Zverev*'s lead frame LF to include the heat transfer channels 1020 as well as the webbed surface-mount leads taught by *Lacap* to improve the thermal characteristics of *Zverev*'s package." *Id.* at 48–49 (citing Ex. 1002 ¶ 179). Petitioner provides an annotated version of Lacap's Figure 10, reproduced below.

24

IPR2022-00307
Patent 7,403,399 B2



*FIG. 10*

Pet. 49.  Lacap's Figure 10 is a top cross-sectional view of an integrated
circuit package.  Ex. 1008, 4:32–35.  Petitioner's annotations include
highlighting in pink the "thermally conductive path between die pad 1000
and the top of pins 930" (not called out in Figure 10) as well as web 920
which "increases the heat dissipation from pins 930."  Pet. 49 (quoting
Ex. 1008, 5:45–47, 5:15–19; citing Fig. 9 (showing label for pins 930)).
According to Petitioner, Lacap's lead frame includes a "wide heat transfer
channel 1020" connecting die pad 1000 to the outer leads, and "heat transfer
channel 1020 is typically made of a metal conductor, such as a copper
alloy."  *Id.* (citing Ex. 1008, 5:26–28, 5:43–47, 5:31–33, 5:2–4).  According
to Petitioner, web 920 of Lacap, which is also "typically made of a metal
conductor such as a copper alloy" (Ex. 1001, 5:2–4) increases the heat
dissipation from pins 930 by increasing the surface area for heat transfer
from pins 930 to the ambient environment.  Pet. 49 (citing Ex. 1008, 5:15–
19).  Thus, argues Petitioner, Lacap's copper-alloy heat transfer channels
1020 and webs 920 serve as cooling areas of the lead frame (i.e. circuit
carrier) for removing heat.  *Id.* at 50.

IPR2022-00307
Patent 7,403,399 B2

Patent Owner argues that neither "Lacap's heat transfer channel nor web . . . are a metallization ***of the circuit carrier*** as claimed." PO Resp. 16. Patent Owner presents an annotated version of Petitioner's annotated version of Zverev's Figure 5 (Pet. 31), reproduced below, to argue that "the lead frame is distinct from the pins extending out from the package" and "the web is not part of Zverev's lead frame (i.e., the circuit carrier) which is inside the package." PO Resp. 16–17 (citing Ex. 2020 ¶¶ 61–63).



Figure 5 of Zverev "shows a schematic sectional view of an advantageous embodiment example of a package with two embedded semiconductor chips." Ex. 1003 ¶ 33. Petitioner's annotations to Zverev's Figure 5 show lead frame (i.e. circuit carrier) in light blue, and Patent Owner's annotation points out the pin with a red arrow. Pet. 31; PO Resp. 16. Patent Owner contends, "Lacap's heat transfer channel is also not part of the lead frame taught by Zverev" because "Lacap teaches that the heat transfer channel connects the die pad to the pins" but "this again is not part of the circuit carrier." PO Resp. 17. In sum, Patent Owner argues, neither the heat transfer channel nor the web is a metallization of the circuit carrier as claimed. *Id.*

IPR2022-00307
Patent 7,403,399 B2

Petitioner replies that Patent Owner's argument "is based on the false premise that the leads (i.e., pins) of a lead frame, such as disclosed in Lacap, are, in fact, not part of a lead frame in Zverev (or Lacap)."  Reply 4–5. Petitioner explains that a "POSA would have known that the lead frame and its leads (i.e., pins) are fabricated from the same piece of metal at the same time and thus the leads are not distinct from the lead frame," relying on evidence and testimony about the fabrication process in support of this argument.  *Id.* at 5 (citing Ex. 1035 ¶ 15; Ex. 1036, 23:9–24:5).  Addressing claim 6's recitation that a "metallization of the circuit carrier . . . has cooling areas," Petitioner states that "the way lead frames are manufactured is very consistent.  You begin with one piece of metal, and you do a very iterative process of stamping out portions until you are left with, finally, the ultimate lead frame that has the leads as well as the chip carrier portion."  Tr. 11:23–12:15, 13:21–24; *see also* Pet. 9–10; Ex. 1010, 24; Ex. 1011, 21.  According to Petitioner, "Lacap and Zverev simply show different views of a lead frame"—a top view in Lacap's Figure 10, and a side view in Zverev's Figure 5—and "Zverev's Fig. 5 is a cross-section through one plane of the package and therefore does not capture how other leads connect to the die pad."  Reply 7–8.  One of ordinary skill in the art, according to Petitioner, "would have known that most semiconductor packages connect the die pad to at least one pin to establish a voltage reference for that portion of metal" and, thus, "at the very least, it would have been obvious to a POSA that the die pad would be connected to one (or more) of the leads for this purpose."  *Id.* at 8 (citing Ex. 1035 ¶ 20).  Additionally, Petitioner argues, nothing in Lacap "refers to the heat transfer channels as 'attachments'" and one of ordinary skill in the art "would have understood that the entirety of Lacap's

27

IPR2022-00307
Patent 7,403,399 B2

lead frame, including the heat transfer channels [1020], was formed from a single piece of metal." *Id.* at 9 (citing Ex. 1035 ¶¶ 15–16, 22).

Patent Owner responds, first, that Lacap's web 920 cannot be the claimed heat sink because it is attached to pins outside the package, and "Petitioner still fails to explain how attaching a web to the outside pins renders the web part of the circuit carrier." Sur-Reply 9. Second, Patent Owner argues that Lacap itself indicates "that the invention is not a standard lead frame as Petitioner alleges." *Id.* at 10 (citing Ex. 1008, 4:6–8).

On the complete record before us, we are persuaded that the combination of Zverev and Lacap teaches the limitations of claim 6. Preliminarily, concerning the term "metallization," Petitioner summarizes that "we've all . . . understood it to mean that there is essentially a metal part of the circuit carrier that has a cooling area that are formed for removing heat." Tr. 12:2–4. Patent Owner does not dispute this understanding of "metallization," and we consider both parties' arguments and evidence regarding "metallization" in view of this understanding.

Turning to the parties' arguments, we find that Petitioner argues persuasively that Zverev's lead frame, or circuit carrier, when combined with Lacap's heat-dissipating webs and channels, yields "a metallization of the circuit carrier" that "has cooling areas that are formed for removing heat." Pet. 48–50. Petitioner's expert supports Petitioner's assertions. Ex. 1002 ¶¶ 178–183; Ex. 1035 ¶¶ 14–23. Regarding Patent Owner's arguments based on Zverev's Figure 5, we credit the testimony that "Zverev's Fig. 5 is a cross-section through one plane of the package" and "does not capture how other leads connect to the die pad." Ex. 1035 ¶ 19. Patent Owner's arguments derive from a narrow interpretation of Zverev's

28

IPR2022-00307
Patent 7,403,399 B2

Figure 5 cross-section in which the lead frame and pins are depicted with a break between them. An interpretation of Zverev in context, however, indicates that, notwithstanding the slice shown in Figure 5, Zverev's pins are connected to its lead frame. Petitioner has shown that the understood and accepted manufacturing process of a lead frame would result in the metal structures shown and relied upon to meet this element. Reply 5 (citing Ex. 1035 ¶ 15; Ex. 1036, 23:9–24:5); Tr. 13:21–24; Pet. 9–10; Ex. 1010, 24; Ex. 1011, 21. We also credit the testimony of Petitioner's expert that a "POSITA would have known that the majority of semiconductor packages connect the die pad to at least one pin to establish a voltage reference" and "it would have been obvious to a POSITA that the die pad would be connected to one (or more) of the leads for this purpose." Ex. 1035 ¶ 20.

Regarding Patent Owner's argument that Lacap has "attachments to the die pad" that are not part of the lead frame, and therefore the heat transfer channel would not be considered part of the circuit carrier or a metallization of the circuit carrier (PO Resp. 17; Ex. 2020 ¶ 64), we agree with Petitioner that Lacap's heat transfer channels are part of the lead frame in the Zverev-Lacap combination. Ex. 1035 ¶ 22. Lacap "is fabricated using the same tools and equipment as standard, unenhanced integrated circuit packaging." Ex. 1008, 4:4–8. We are persuaded that, understanding the manufacturing process behind Lacap, one of ordinary skill in the art "would have understood that the entirety of Lacap's lead frame, including the heat transfer channels [1020], was formed from a single piece of metal." Reply 9 (citing Ex. 1035 ¶¶ 15–16, 22). We also agree that "Lacap makes clear that its heat transfer channels are an integral part of the lead frame" rather than "attachments." *Id.*

29

IPR2022-00307
Patent 7,403,399 B2

We disagree with Patent Owner's argument that "Lacap's web 920 cannot be the claimed heat sink because it is attached to pins outside the package." Sur-Reply 9. Petitioner identifies Lacap's heat transfer channels 1020 and webs 920 as cooling areas of the lead frame (i.e. circuit carrier) for removing heat. Pet. 50. We see no claim requirement that the recited cooling areas be located inside an integrated circuit package. Even if there were such a requirement, however, Lacap's heat transfer channels 1020 are shown *inside* outline 1030 that indicates the limits of the plastic molding 900 in Lacap's Figure 10. Ex. 1008, 4:32–35, 5:26–28, 5:37–39, Figs. 9, 10 (Figure 9 showing web 920 and plastic molding 900, and Figure 10 showing a top cross-sectional view of Figure 9, showing heat transfer channels 1020 inside outline 1030).

Accordingly, Petitioner has met its burden of demonstrating that the combination of Zverev and Lacap meets the limitations of claim 6. We also find that a person of ordinary skill in the art would have combined the teachings of Zverev and Lacap to "improve the thermal characteristics of *Zverev*'s package," with a reasonable expectation of success, as asserted by Petitioner. Pet. 48–49. Based on these findings, and for the reasons discussed above, we conclude that the subject matter of claim 6 would have been obvious based on the combined teachings of Zverev and Lacap.

### 2. *Ground 2 (Liaw and Nam)*

Petitioner, relying on its claim 1 arguments for Liaw and Nam, argues that this combination also would have rendered obvious claim 6. Pet. 50–62, 66–68. Petitioner argues that one of ordinary skill in the art would have understood that Nam's lead frame 100 is formed of metal. *Id.* at 66 (citing

30

Appx30

IPR2022-00307
Patent 7,403,399 B2

Ex. 1002 ¶¶ 65–71, 218).  Petitioner's annotated Figure 4 of Nam is
reproduced below.



Figure 4 of Nam "is a plan view for explaining a power device having a
multi-chip package structure."  Ex. 1005 ¶ 24.  Petitioner argues that "chip
pad 102 of lead frame 100 (i.e., the circuit carrier) has a large area (i.e.,
cooling areas) relative to the size of transistor chip 108."  Pet. 66.
According to Petitioner, Nam "describes chip pad 102 as part of the lead
frame 100," and a "POSITA would have understood that the continuity of
metal provided by lead frame 100 creates a direct thermal path for
dissipating heat generated by transistor chip 108."  *Id.* at 67 (citing Ex. 1005
¶ 32 (describing "lead frame 100 having a chip pad 102"); Ex. 1002 ¶ 219).
Additionally, Petitioner argues, a "POSITA would have understood that the
exposed portion of *Nam*'s chip pad 102 serves to dissipate heat generated
inside the package to the surrounding environment outside the package."  *Id.*
at 68 (citing Ex. 1002 ¶ 220).

31

IPR2022-00307
Patent 7,403,399 B2

Patent Owner argues that Nam's chip pad 102 "is never described as metal—nor does the Petition allege as such." PO Resp. 18. Patent Owner posits that the chip pad could be ceramic or epoxy, which would not be a "metallization." *Id.* (citing Ex. 2022, 18:13–25). Patent Owner contends that the "Petition's only argument that chip pad 102 could be metal is a statement that the '399 Patent utilizes a large metal surface of the lead frame" but that "Nam never describes its chip pad 102 as metal" and therefore "lacks a metallization of the circuit carrier." *Id.* at 19 (citing Ex. 2020 ¶ 65).

Petitioner replies that it did "argue in its Petition that Nam's lead frame is metal." Reply 10 (quoting Pet. 67 ("A POSITA would have understood that the continuity of ***metal provided by lead frame 100*** creates a direct thermal path for dissipating heat generated by transistor chip 108.")). Petitioner provides "multiple reasons" that Patent Owner's "argument that Nam's lead frame is not metal is wrong": (1) "Nam discloses a 'coining' process used on its lead frame, and a coining process is only used on metals in semiconductor packaging processes" but not used on ceramic or epoxy (*id.* at 10–12 (citing Ex. 1035 ¶¶ 25–29)); (2) "it was well known to a POSA that metals are used to conduct electricity in semiconductor packaging," and a "POSA would have understood Nam's disclosure to be discussing a metal lead frame," particularly in view of Nam's use of an insulating tape, Nam's package configuration, and Nam's metal wire bond (*id.* at 12 (citing Ex. 1035 ¶¶ 30–32)); (3) "Nam's disclosure of an insulating tape confirms that its lead frame is metal" and "the chip pad of the lead frame is made of a metal" because, "if the chip pad of the lead frame was made of a ceramic or epoxy (which are insulators), then an insulating tape for the control IC chip

32

Appx32

IPR2022-00307
Patent 7,403,399 B2

would not be needed" (*id*. at 12–13 (citing Ex. 1035 ¶¶ 33–35)); and (4) a
"POSA in reviewing Nam's semiconductor package would have recognized
it as a common power package that has the backside of the lead frame
exposed for soldering to a PCB or connecting to a heat sink with a thermal
interface material" (*id.* at 13 (citing Ex. 1035 ¶¶ 36–38)).

Patent Owner responds that (1) Nam describes 106 as the coining
portion, but the Petition relies on chip pad area 102 surrounding
transistor 108 as the cooling area, so even if coining portion 106 is metal,
that is insufficient to show chip pad 102 is metal; (2) the Reply's assertion
that metals are well known in semiconductor packaging is insufficient;
(3) the purpose of insulating adhesive tape is to insulate control chip 112
from transistor chip 108 and says nothing about whether the chip pad is
metal; and (4) the Reply's assertion that it was well known to solder power
packages to a PCB is insufficient.  Sur-Reply 10–11.

We have reviewed the parties' arguments and evidence and are
persuaded that Petitioner has met its burden by a preponderance of the
evidence.  The dispute appears to stem from Patent Owner's assertion that
chip pad 102 is separate and distinct from lead frame 100 (PO Resp. 17–19;
Sur-Reply 10–11), whereas Petitioner takes the position that chip pad 102 is
part of lead frame 100 (Pet. 66–67 (relying on annotated Figure 4 of Nam,
highlighting lead frame 100 (including chip pad 102) in light blue);
Reply 10–13).  We agree with Petitioner's position that Nam's chip pad 102
is part of lead frame 100, which Petitioner has persuasively argued are all
made of metal.  Reply 10; Pet. 67; *see* Ex. 1005 ¶ 32 (discussing "lead
frame 100 having a chip pad 102" in reference to Figure 4).  Petitioner
articulates in the Petition that it relies on chip pad 102 as part of lead

33

IPR2022-00307
Patent 7,403,399 B2

frame 100 as the metallization in claim 6. Pet. 66–68 (citing Ex. 1002
¶¶ 65–71). The Reply provides additional properly responsive reasons that
chip pad 102, as part of lead frame 100, would have been understood to be
metal. Reply 10–13 (citing Ex. 1035 ¶¶ 25–38). Petitioner also argues that
Patent Owner's expert agreed that chip pad 102 was metal. *Id.* at 12–13
(quoting Ex. 1036, 29:16–30:12 ("Q. Is it fair to say the chip pad as the lead
frame is a metal, as opposed to an insulator in Nam? A. As it relates to
Nam . . . I think a POSITA would understand that, yes, the chip frame is
metal - - or is a conducting material, which we're saying, generally, is metal
and therefore requires the insulation.")). Accordingly, Petitioner has met its
burden of demonstrating that the combination of Liaw and Nam meets the
limitations of claim 6.

As discussed above, we also find that a person of ordinary skill in the
art would have combined the teachings of Liaw and Nam with a reasonable
expectation of success. We conclude that the subject matter of claim 6
would have been obvious based on the combined teachings of Liaw and
Nam.

### 3. Grounds 1B and 3B

Petitioner also argues that claim 6 would have been obvious over the
combination of Zverev and Shiraishi (Ground 1B) and Liaw, Lin, and
Shiraishi (Ground 3B). Petitioner presents arguments based on Shiraishi as
a secondary reference as the basis for its challenge of claim 6 under
Grounds 1B and 3B. Pet. 36–42, 82–85. We do not determine the merits of
Grounds 1B and 3B. Having determined that Petitioner has met its burden
of demonstrating that claim 6 would have been obvious over the
combination of Zverev and Lacap (Ground 1C) and Liaw and Nam

34

Appx34

IPR2022-00307
Patent 7,403,399 B2

(Ground 2), we need not reach the alternative grounds. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address [alternative grounds] that are not necessary to the resolution of the proceeding.").

### H.    Claim 10 – Grounds 1A, 2, and 3A

Claim 10, which depends from disclaimed claim 1, further requires that additional active components 106, 108, and 110 "are at least partially combined into a single semiconductor chip and are monolithically integrated."  Ex. 1001, 6:62–65.  Petitioner argues that claim 10 was anticipated by Zverev (Ground 1A) and would have been obvious over both Liaw and Nam (Ground 2) and Liaw and Lin (Ground 3A).  Patent Owner disagrees.  PO Resp. 20–23.

#### 1.    Ground 1A (Zverev)

Petitioner, relying on its Ground 1A arguments for Zverev alone to further argue that Zverev anticipated claim 10, contends that Zverev's "switch T2 and sense MOSFET T3 (collectively, the additional active components)" are "monolithically integrated on the single semiconductor chip CH1," as shown in annotated Figure 4, reproduced below.  Pet. 34–35.

35

IPR2022-00307
Patent 7,403,399 B2



Figure 4 of Zverev "shows in top view a schematic diagram of a cell array ZF in which the power MOSFET T1, the MOSFET T2 acting as a current source, and a sense MOSFET T3 are integrated on a single semiconductor chip CH1." Ex. 1003 ¶ 47. Referring to recitations of claim 1, Petitioner's annotations identify Zverev's cell array ZF (pink) as a "primary-sided switch," MOSFETs T1 and T2 (blue) as "additional active, primary-side components," and semiconductor chip CH1 (purple) as an "additional semiconductor chip." Pet. 35.

Patent Owner argues that "[w]hile Zverev shows a single semiconductor chip, Zverev is silent as to whether that chip is 'monolithically integrated.'" PO Resp. 21. According to Patent Owner, "monolithically integrated" means "the chip and circuit elements must be fabricated using a single piece of silicon" whereas "integrated alone may encompass other forms of integration such as hybrid integration that forms a circuit on a semiconductor chip with more than one piece of silicon." *Id.* at 20–21. Without disclosure of the lithographic process used to fabricate

36

IPR2022-00307
Patent 7,403,399 B2

Zverev's semiconductor chip, Patent Owner argues, "a POSITA would at most understand from Zverev's single semiconductor chip that circuit elements are placed on a single chip—but with no requirement that the chip is fabricated from a single piece of silicon." *Id.* at 22 (citing Ex. 2020 ¶¶ 70–72).

Petitioner replies that "Zverev monolithically integrates circuitry in the same die." Reply 22. Petitioner asserts a skilled artisan would have had this understanding for several reasons: (1) Zverev uses the term "semiconductor chip," which one of ordinary skill in the art would understand "is referring to a single IC die, not a multi-die package," instead of using terms such as "multi-chip module, MCM, multi-chip package, or hybrid" that would indicate more than one piece of semiconductor material (*id.* (citing Ex. 1035 ¶ 45)); (2) Zverev expressly distinguishes "chip" from "package" and "explains that two semiconductor chips (i.e. two dies) are arranged in a single package," which "expressly rejects" Patent Owner's "underlying argument for validity here—that 'chip' and 'package' are synonyms" (*id.* at 22–23 (citing Ex. 1035 ¶¶ 46–47)); and (3) Zverev discloses that the switching transistor and the supply device, which are in the same chip, are also in the "same cell array," which Petitioner argues means "a plurality of single transistors" on a single piece of semiconductor material, such that Zverev's active components T2 and T3 are "fabricated on the same piece of semiconductor material (i.e. monolithically integrated on the same die))" (*id.* at 23–25 (citing Ex. 1003 ¶¶ 19–20, 47–48, Fig. 4; Ex. 1035 ¶¶ 48–53)).

Patent Owner responds that "[n]othing in the term 'single semiconductor chip' alone indicates or requires that the chip be fabricated

37

IPR2022-00307
Patent 7,403,399 B2

from a single piece of semiconductor material." Sur-Reply 6 (citing Ex. 2020 ¶¶ 70–72). Patent Owner argues that Zverev's Figure 4 "does not show anything concerning how the array is fabricated and certainly does not show that the array is fabricated from a single piece of semiconductor material." *Id.* at 7.

Having considered the parties' arguments and evidence, we are persuaded that Zverev discloses the limitations of claim 10. Petitioner demonstrates persuasively that switch T2 and sense MOSFET T3 are monolithically integrated on a single semiconductor chip CH1. Pet. 34–35; Ex. 1002 ¶ 147–148; Ex. 1003 ¶ 47, Fig. 4. Petitioner also demonstrates persuasively that Zverev's use of the term "chip" (i.e. a single chip or die) as opposed to "package" (i.e., two chips arranged together) shows that the "single semiconductor chip" is synonymous with "single semiconductor die," i.e., fabricated from a single piece of semiconductor material. Reply 22–23 (citing Ex. 1003 ¶ 18; Ex. 1036, 50:15–51:11 (Patent Owner's expert acknowledging this distinction)); *see also* Ex. 1035 ¶¶ 7 (citing Ex. 1001, 4:63–64 as equating semiconductor chips with dies: "separate semiconductor chips, also called dies"), 11. On this point, we credit Petitioner's expert: the "plain and ordinary meaning" of Zverev's "integrated on a single semiconductor chip" language "is that there is one piece of semiconductor material (i.e. chip, die) that has the switching transistor, supply device, and/or the sense MOSFET fabricated as an integrated circuit." Ex. 1035 ¶ 47. In sum, we are persuaded that Zverev "is using 'chip' synonymously with 'die', i.e., fabricated from a single piece of semiconductor material" rather than synonymously with "package" or any

38

IPR2022-00307
Patent 7,403,399 B2

other terminology that would indicate anything other than fabricated from a single piece of semiconductor material.  *Id.*

Regarding Patent Owner's argument that Zverev's terminology "single semiconductor chip" does not mean "monolithically integrated," we are persuaded by Petitioner's evidence and argument to the contrary, as summarized above.  Regarding Patent Owner's argument that nothing about Zverev's Figure 4 or description shows how Zverev's cell array is fabricated, we agree with Petitioner's argument that Zverev's fabrication process and cell array description show that the additional active components are "monolithically integrated."  Petitioner persuasively argues that Zverev's "cell array" refers to a "plurality of single transistors" "connected with their load paths and control terminals in parallel to each other," as described in Zverev, and, therefore, "on a single piece of semiconductor material."  Reply 23–24 (quoting Ex. 1003 ¶¶ 19–20; citing Ex. 1035 ¶¶ 48–49; Ex. 1036, 54:18–55:16).  We credit Petitioner's expert's reasoning and testimony that, to accomplish Zverev's configuration of transistors in the same cell array, "these transistors must be on the same piece of semiconductor material."  Ex. 1035 ¶ 49 (citing Ex. 1003 ¶ 20, Fig. 4).  We further credit Petitioner's expert's testimony that the "details and connections within Figure 4" (Ex. 1003 ¶¶ 47–48) showing and describing the placement of various transistors (i.e. T1, T2, and T3 on chip CH1) teach that T1, T2, and T3 are monolithically integrated on one die.  Ex. 1035 ¶¶ 51–52.  We have considered Patent Owner's counterargument that Zverev's "chip" need not "be fabricated from a single piece of semiconductor material" (Sur-Reply 6–7; Ex. 2020 ¶¶ 70–72), but find this argument lacks supporting evidence and fails to rebut Petitioner's showing

39

IPR2022-00307
Patent 7,403,399 B2

regarding Zverev's fabrication of a single chip/die with multiple transistors in the same cell array.  Accordingly, Petitioner has met its burden of demonstrating that Zverev meets the limitations of claim 6 and, therefore, anticipated claim 6.

### 2.  Ground 2 (Liaw and Nam)

Petitioner relies on its claim 1 arguments for Ground 2 to argue that Liaw and Nam would have rendered obvious claim 10.  Pet. 68–70. Petitioner's annotated Figure 3 of Liaw is reproduced below.



Fig.3

Pet. 69.  Figure 3 of Liaw is "a circuit diagram of a high voltage chip." Ex. 1004, 2:34–35.  Petitioner argues that "*Liaw*'s 'junction FET 80,' 'power MOS transistor 82' (also referred to as a 'current sense transistor'), and 'Zener diode 84'" are collectively, the "additional active primary-sided

40

IPR2022-00307
Patent 7,403,399 B2

components" (blue) and are "all monolithically integrated within 'high-voltage chip 60' (i.e., a single semiconductor chip)" (purple). Pet. 69. Petitioner further relies on Liaw's annotated Figure 4, which is reproduced below.



Pet. 70. Figure 4 of Liaw is "a cross-sectional view of the high voltage chip." Ex. 1004, 2:36–37. Petitioner argues that annotated Figure 4 "shows each of these additional active components monolithically integrated on high-voltage chip 60 with a single substrate 86." *Id.* (citing Ex. 1004, 3:39–4:16, claims 1, 3; Ex. 1002 ¶ 222).

Patent Owner argues that "Liaw at most discloses a single semiconductor chip and does not disclose that this semiconductor chip is monolithically integrated" and that "a teaching of a single semiconductor chip is insufficient to suggest that the semiconductor chip is monolithically integrated." PO Resp. 22 (citing Ex. 2020 ¶ 71).

41

IPR2022-00307
Patent 7,403,399 B2

Petitioner replies that Liaw "uses the term 'single chip,'" which refers to a single die, in contrast to Liaw's use of a "chip set" packaged in a "module" to refer to two distinct chips.  Reply 26.  Petitioner contrasts Liaw's disclosure of its relevant circuitry "integrated on a single chip" (Ex. 1004, 1:15–19, 2:11–15) with Liaw's disclosure of "two distinct chips" also described as a "chip set" packaged in a "module" (Ex. 1004, 2:16–21). Reply 26.  Petitioner argues that "one 'chip' of Liaw (i.e., one die) individually contains all the claimed components of claim 10."  *Id.* (citing Ex. 1035 ¶¶ 54–56).  "Accordingly, Liaw's 'chip' is a die and thus is monolithically integrated."  *Id.* at 27 (citing Ex. 1035 ¶ 57).

Patent Owner responds that "Liaw's use of the term 'single chip' does not indicate its single chip is fabricated from a single piece of material because a single chip may still be fabricated from multiple pieces of material."  Sur-Reply 8.

We determine that Liaw's disclosure of how its active components are integrated on a single chip (i.e., die) teaches that Liaw's additional active components are monolithically integrated.  We are persuaded by Petitioner's arguments explaining how the "relevant circuitry of Liaw is monolithically integrated."  Reply 26–27 (citing Ex. 1004, 1:15–19, 2:11–15).  We credit Petitioner's expert's interpretation of Liaw:  "The only reason for Liaw to state that [the JFET and power MOS transistor] are fabricated in a 'compatible' semiconductor 'process' is so that they can be integrated on a single chip (die)."  Ex. 1035 ¶ 54 (discussing Ex. 1004, 2:11–15). Accordingly, Petitioner has met its burden of demonstrating that Liaw in combination with Nam meets the limitations of claim 10.

42

IPR2022-00307
Patent 7,403,399 B2

As discussed above, we also find that a person of ordinary skill in the art would have combined the teachings of Liaw and Nam, with a reasonable expectation of success. We conclude, therefore, that the subject matter of claim 10 would have been obvious based on the combined teachings of Liaw and Nam.

### 3. *Ground 3A (Liaw and Lin)*

Petitioner also argues that claim 10 would have been obvious over the combination of Liaw and Lin (Ground 3A). Pet. 81. We do not determine the merits of Ground 3A. Having determined that Petitioner has met its burden of demonstrating that claim 10 would have been anticipated by Zverev (Ground 1A) and would have been obvious over the combination of Liaw and Nam (Ground 2), we need not reach this additional ground. *See SAS Inst. Inc.*, 138 S. Ct. at 1359; *Boston Sci. Scimed, Inc.*, 809 F. App'x at 990.

43

IPR2022-00307
Patent 7,403,399 B2

### III.    CONCLUSION[11]

For the reasons discussed above, we determine Petitioner meets its burden of establishing, by a preponderance of the evidence, that the challenged claims are unpatentable, as summarized in the following table:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 10 | § 102 | Zverev | 10 | |
| 6 | § 103 | Zverev, Shiraishi[12] | | |
| 6 | § 103 | Zverev, Lacap | 6 | |
| 6, 10 | § 103 | Liaw, Nam | 6, 10 | |
| 10 | § 103 | Liaw, Lin | | |
| 6 | § 103 | Liaw, Lin, Shiraishi | | |
| **Overall Outcome** | | | 6, 10 | |

---

[11]  Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).
[12]  As explained above, because we determine that the challenged claims are unpatentable on other grounds, we decline to address the remaining grounds.

44

IPR2022-00307
Patent 7,403,399 B2

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner establishes, by a preponderance of the evidence, that claims 6 and 10 of U.S. Patent No. Patent 7,403,399 B2 are unpatentable; and

FURTHER ORDERED that this is a Final Written Decision; therefore, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

45

IPR2022-00307
Patent 7,403,399 B2

FOR PETITIONER:

Eliot Williams
Neil Sirota
Brett Thompsen
BAKER BOTTS L.L.P.
Eliot.williams@bakerbotts.com
Neil.sirota@bakerbotts.com
Brett.thompsen@bakerbotts.com


FOR PATENT OWNER:

James T. Carmichael
Stephen McBride
Minghui Yang
CARMICHAEL IP, PLLC
kim@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com

46



US007403399B2

(12) **United States Patent**     (10) Patent No.:     **US 7,403,399 B2**
Morbe et al.                       (45) Date of Patent:     **Jul. 22, 2008**

(54) **ACTIVE PRIMARY-SIDED CIRCUIT ARRANGEMENT FOR A SWITCH-MODE POWER SUPPLY**

(75) Inventors: **Stefan Morbe**, Hasbergen (DE); **Michael Bothe**, Munster (DE)

(73) Assignee: **FRIWO Mobile Power GmbH**, Ostbevern (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 313 days.

(21) Appl. No.: **11/394,734**

(22) Filed: **Mar. 30, 2006**

(65) **Prior Publication Data**

US 2006/0238927 A1     Oct. 26, 2006

(30) **Foreign Application Priority Data**

Mar. 31, 2005   (DE) ...................... 10 2005 014 746

(51) **Int. Cl.**
    *H02M 1/00*     (2007.01)
    *H01K 7/06*     (2006.01)
(52) **U.S. Cl.** .......................... 361/820; 323/351; 363/37; 363/97
(58) **Field of Classification Search** .................. 361/820; 362/37, 97; 323/351
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,355,301 A   10/1994   Saito et al.

6,134,123 A   10/2000   Yamada

FOREIGN PATENT DOCUMENTS

DE   39 16 980   12/1989

*Primary Examiner*—Evan Pert
(74) *Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

(57)     **ABSTRACT**

The invention under consideration refers to a circuit arrangement for a switch-mode power supply, wherein the switch-mode power supply has a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer, and wherein the circuit arrangement comprises a primary-sided switch, a control circuit for controlling the primary-sided switch and additional active primary-sided components. Furthermore, the invention under consideration also refers to a switch-mode power supply with an active primary-sided circuit arrangement of that type. In order to specify an improved circuit arrangement that overcomes the disadvantages of the known solutions and that makes it possible to assemble a switch-mode power supply in miniaturised form in a manner that is particularly simple and economical while still complying with applicable safety standards, the control circuit is formed by a first integrated semiconductor chip and the primary-sided switch and the additional components are integrated in at least one additional semiconductor chip, said semiconductor chip being separate from the control circuit and being arranged on a single circuit carrier shared with the control circuit.

**13 Claims, 3 Drawing Sheets**



Samsung, EX1001, p. 1

Appx47



*FIG. 1*

Samsung, EX1001, p. 2

Appx48



FIG. 2

FIG. 3

Samsung, EX1001, p. 3

100



*FIG. 4*



*FIG. 5*

Samsung, EX1001, p. 4

Appx50

US 7,403,399 B2

**1**

## ACTIVE PRIMARY-SIDED CIRCUIT ARRANGEMENT FOR A SWITCH-MODE POWER SUPPLY

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a circuit arrangement for a switch-mode power supply, wherein the switch-mode power supply has a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer, and wherein the circuit arrangement comprises a primary-sided switch, a control circuit for controlling the primary-sided switch and additional active primary-sided components. Furthermore, the invention under consideration also refers to a switch-mode power supply with such an active primary-sided circuit arrangement.

2. Description of the Related Art

Charging devices in the low power range are normally implemented as switch-mode power supplies today. Because of the compact design and low weight, these have gained acceptance in many application cases and are superseding the traditional linear devices. In spite of the advancing integration of separate circuit components, such as in the form of integrated circuits (so-called ASICs, or Application Specific Integrated Circuits), for example, the electronics needed for a switch-mode power supply are still comparatively complex and the primary-sided circuit arrangement of a switch-mode power supply of that type consists of more than 20 separate circuit components.

FIG. **1**, in the form of a wiring diagram, shows the circuit diagram of the primary side of a switch-mode power supply with primary regulation. The total of 24 components can be assigned here as follows: a converter-transformer **120**, in which only the primary-sided winding **122** and the auxiliary winding **124** are depicted, 16 passive components, such as resistors, inductors and capacitors, and up to eight active components. The active components form the active primary-sided circuit arrangement of the switch-mode power supply and comprise four single diodes, which form a bridge rectifier **106**, the switching transistor **102**, an ASIC for pulse width modulation of the primary-sided switching transistor as control circuit **104** of the primary-sided switch **102**, an auxiliary voltage diode **108** and a snubber diode **110**.

In order to reduce the space requirements of the single components, there are currently various approaches, most of which are, however, not far-reaching enough and extend over only a few elements.

For example, in the area of the passive components, various resistors and even RC functions are integrated in one element array.

From the US American printed patent specification U.S. Pat. No. 6,134,123, it is furthermore known to accommodate the primary-sided switch and the control circuit for a switch-mode power supply on a common substrate and to produce it as a hybrid IC.

The solution disclosed in this publication, however, has the disadvantage that a major portion of the space-consuming elements, such as the rectifier or the auxiliary voltage and snubber diodes are still provided as external elements. Therefore, although this known solution achieves increased stability of the switch-mode power supply because of the spatial proximity of the control circuit and the primary-sided switch, no more extensive advantages are achieved with regard to miniaturization of a switch-mode power supply of that type.

Furthermore, from U.S. Pat. No. 5,355,301, a switch-mode power supply is known in which a printed converter is used.

**2**

The active components, i.e., the bridge rectifier, primary-sided switch, control circuit and secondary diode are integrated in a single chip in this case and, assembled with the printed converter in a shared substrate. The contacting between this active chip and the voltage-converting area is accomplished via a further wiring layer. The contacting to the active chip is produced here via appropriate openings in the chip. The active element is consequently a constituent of a fully integrated switch-mode power supply and is not produced as a separate IC in its own IC housing.

The solution shown here therefore has, firstly, the disadvantage that the secondary diode that is also integrated does not make possible primary/secondary separation according to applicable standards. Furthermore, the technical solution of a fully integrated switch-mode power supply represents a very complex concept that can only be realized with high manufacturing costs.

In addition to the mentioned complexity of the components, the manufacture of the known switch-mode power supplies additionally requires complex logistics for the procurement of the single components and substantial investments in pick-and-place machines and testing technology for the manufacture.

### SUMMARY OF THE INVENTION

There is, therefore, a need for providing an improved circuit arrangement, which overcomes the disadvantages of the known solutions and makes it possible to assemble a switch-mode power supply in miniaturized form in an especially simple and economical way, while still complying with applicable safety standards.

This object is solved by means of the subject matter of claim **1**. Advantageous further developments of the invention under consideration are the subject matter of various dependent claims.

The present invention is based on the idea that, in the case of a primary-sided switch-mode power supply, a circuit arrangement that comprises the primary-sided switch, a control circuit for controlling the primary-sided switch and additional active primary-sided components is executed in such a way that the control circuit is formed by a first integrated semiconductor chip and that the primary-sided switch and the additional components are integrated in at least one additional semiconductor chip, said semiconductor chip being separate from the control circuit and arranged on a circuit carrier shared with the control circuit.

In this way, a number of active components can be combined with the help of a circuit arrangement according to the invention in the form of a module, said components being found in a primary circuit of a switch-mode power supply. These are the components of the input rectifier for the 50/60 Hz voltage, the switching transistor, the control circuit and diodes for the snubber circuit and the auxiliary power supply.

The active components here are not executed in a discrete construction, as is customary, but are instead assembled on a shared circuit carrier and, according to an advantageous further development, accommodated in a shared IC housing. In this way, the result is a considerable decrease in the space requirement, as well as a reduction of possible error sources caused by faulty contacting of the individual elements to a further circuit carrier, for example, a printed circuit board. Furthermore, advantages arise during the production process as a result of the considerably reduced logistics effort for

Samsung, EX1001, p. 5

US 7,403,399 B2

**3**

procuring elements. Because of the combination into a single element, the effort for mounting is reduced, and therefore the investments in the manufacture are also reduced.

If one compares known circuit arrangements that are assembled in a discrete construction with an implementation according to the present invention, the minimum area requirement of the discretely assembled single components amounts to approximately 100 mm², wherein the likewise required electrical connections between these elements are not taken into consideration. The integrated module according to the present invention can be implemented with dimensions of 5×5 mm² or less, however, and consequently demands only a quarter of the area of conventional circuit arrangements.

Furthermore, with the circuit arrangement according to the invention, it is also possible to achieve a reduction in the overall heights in comparison to single components. The individual semiconductor chips are arranged next to one another, so that the result is a lower overall height. The additional space requirement for this arrangement in one level is more than compensated for by the integration of the active components and the savings in area associated with it. While the overall height of single elements amounts to up to 3 mm, when all elements are integrated, for example, into a so-called MLP housing (Micro Leadframe Package), the height is only 1 mm.

The circuit arrangement according to the invention can be executed here either in a wired housing or in a housing that can be surface-mounted for Surface Mount Technology (SMT). The wired elements in this case are compatible with conventional Through Hole Technology (THT), while in the case of an embodiment as an SMD (Surface Mounted Device), the advantages of this extensively miniaturized technology can be utilized.

With this low overall height, two-sided cooling of the circuit module is furthermore possible in an advantageous way. For example, the metallization of a leadframe can be run out towards the bottom, directly on to the printed circuit board. Because of the low height and the good heat conduction by the housing that is associated with said low height, cooling even on the surface brings significant advantages.

Furthermore, continued monolithic integration of the elements used can make it possible to achieve additional miniaturisation of the circuit arrangement, and the number of electrical connections among the elements can be reduced, so that the reliability of the entire element can be increased.

An additional advantage of the solution according to the invention exists in the reduction of parasitic inductances, which result from connections among the discrete elements. Because the distances between elements are greatly reduced in comparison to the discrete version, parasitic inductances of the electrical connections are greatly reduced. This applies both to connections within the module and to connections outside it.

Last but not least, it is naturally also possible to realise cost benefits as a result of the savings in the overall height and overall area.

According to an advantageous further development of the present invention, if one implements those additional components that are under high voltages in Silicon-on-insulator technology (SOI) and the control circuit in conventional silicon technology, it is possible to achieve a reduction in the installation size, because the distances between the parts under high voltages can again be reduced. Without SOI, if, for example, there were four rectifier diodes, one would have to place each of the four dies on different areas of a leadframe. These areas have to be somewhat larger than the corresponding die. In SOI technology, one can realise the four diodes in

**4**

a single die, so that the additional space requirements for the areas on the leadframe, including the insulation gaps in between, are dropped.

The advantageous properties of the circuit arrangement according to the invention are particularly effective when used in a primary-controlled switch-mode power supply.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings are incorporated into and form a part of the specification for the purpose of explaining the principles of the invention. The drawings are not to be construed as limiting the invention to only the illustrated and described examples of how the invention can be made and used. Further features and advantages will become apparent from the following and more particular description of the invention is illustrated in the accompanying drawings, wherein:

FIG. **1** shows a circuit diagram for a primary-sided circuit arrangement for a switch-mode power supply;

FIG. **2** shows an active primary-sided circuit arrangement according to the invention on a circuit carrier in accordance with a first embodiment;

FIG. **3** shows a second advantageous embodiment with monolithically integrated bridge rectifier;

FIG. **4** shows a full-scale comparison of the embodiments shown in FIGS. **2** and **3**, for a comparison of the sizes;

FIG. **5** shows a third embodiment of the circuit arrangement according to the invention.

DETAILED DESCRIPTION OF THE INVENTION

The illustrated embodiments of the present invention will be described with reference to the figure drawings wherein like elements and structures are indicated by like reference numbers.

Referring to the figures, and particularly to FIG. **2**, a first embodiment of the active primary-sided circuit arrangement **100** according to the invention will be explained in more detail. In the embodiment shown, the circuit arrangement according to the invention is implemented by way of example as a so-called "Micro Leadframe Package" component (MLP component). A leadframe **112** functions as the circuit carrier here and can, for example, be made of a copper alloy. The individual semiconductor elements are glued or soldered to the respective areas of the leadframe **112** that are provided for them and appropriately contacted using bonding wires **114**.

One example of an advantage of MLP technology is that extremely small dimensions can be achieved when conventional copper-leadframe technology is used. At the same time, the electrical and thermal properties can be improved.

As a shared housing, which is referred to schematically with the reference number **118**, a casting compound, for example, an epoxy resin, is die-cast around the arrangement.

Naturally the principles according to the invention can also be used for other housing and circuit carrier technologies. For example, ceramic circuit carriers, flexible circuit carriers, ball grid arrays or the like can be used.

In the embodiment shown in FIG. **2**, the switching transistor **102**, the control circuit **104** (also identified as the control IC), as well as the snubber diode **110**, the diodes for the bridge rectifier **106** and the diode for the auxiliary power supply **108** are initially present as separate semiconductor chips, also called dies. Corresponding areas are present on the leadframe **112** in order to be able to hold the various semiconductor chips. A single contacting of the semiconductor chip to the outer terminals **116** of the module can be produced via these

Samsung, EX1001, p. 6

US 7,403,399 B2

**5**

areas. All additional contacting of the semiconductor chips to the outer terminals **116** of the module can be produced via bonding wires **114**. These bonding wires **116** can, for example, be produced from gold, as so-called thermo-ultra-sound bonding connections.

To some extent, connections between the elements used in the module, for example, between the control IC **104** and the switching transistor **102**, are stipulated by the circuit topology. These connections can be produced by means of internal bonding wires during the manufacture. This simplifies the layout of a printed circuit board that is not shown here, on which the module will be applied at a later time.

In the design of the leadframe **112**, it is always necessary to pay attention to voltage differences and corresponding insulation, as well as to sufficient heat dissipation. Parts of the circuit arrangement **100** according to the invention that are under high voltages, for example, the bridge rectifier **106**, and parts with lower voltages, e.g., the diode for the auxiliary voltage **108** must be appropriately arranged so that they are physically separated or electrically insulated.

For elements that require a large cooling surface, a correspondingly large metal surface can be provided on the leadframe **112**. This is shown for the switching transistor **102** in FIG. **2** by way of example. This metal surface of the leadframe **112** can also be openly run downwards out of the circuit arrangement housing, which is not shown here, and come to rest directly on the printed circuit board, so that a good thermal connection to the printed circuit board is attained.

Optionally, it is also possible to use several external terminals **116** for an internal terminal, in order to increase the current-carrying capacity of the corresponding internal terminal.

Further miniaturisation of the overall arrangement can be achieved by means of additional monolithic integration of multiple elements within the circuit arrangement **100**. FIG. **3** shows an embodiment in which an integrated bridge rectifier circuit **106** is provided, in place of the four single diodes of the bridge rectifier. Instead of the four individual diode chips shown in FIG. **2**, all four diodes are integrated on one die in silicon-on-insulator (SOI) technology. With the help of this technology, further miniaturisation of the module **100** can be achieved, because a compact construction of the individual constituents of the circuit results from the monolithic integration.

A comparison of the relative sizes is shown in FIG. **4** by means of a full-scale comparison of the circuit arrangements **100** from FIG. **2** and FIG. **3**. By using a monolithically integrated element for the bridge rectifier **106**, it is possible to reduce the required area from about 20 mm$^2$ to about 12 mm$^2$.

If additional elements are combined, for example, the control circuit **104** and the switching transistor **102**, one arrives at a configuration such as the one shown in FIG. **5**. The dimensions here can be even further reduced in that, on the one hand, the required area becomes even less because a single IC **105** is used instead of the single chips **102** and **104** shown in FIG. **2** and because, in particular, there is also a reduction in the number of internal connections made with bonding wires. This elimination of internal bonding wires furthermore also increases the reliability of the overall circuit arrangement.

With the help of the method according to the invention, namely the integration of the active primary-sided components on one circuit carrier and in a single housing, the result is consequently that, first, the necessary constructed space is significantly reduced and, second, that additional miniaturization can be achieved by means of the further monolithic integration of the elements used. In addition to the savings in

**6**

the constructed space, a clear increase in the reliability of the overall element is also possible.

The circuit arrangement according to the invention can naturally be executed both for the SMD (Surface Mounted Device) and as a wired element for conventional through-hole technology.

While the invention has been described with respect to the physical embodiments constructed in accordance therewith, it will be apparent to those skilled in the art that various modifications, variations and improvements of the present invention may be made in the light of the above teachings and within the purview of the appended claims without departing from the spirit and intended scope of the invention.

In addition, those areas in which it is believed that those ordinary skilled in the art are familiar have not been described herein in order to not unnecessarily obscure the invention described herein. Accordingly, it is to be understood that the invention is not to be limited by the specific illustrated embodiments, but only by the scope of the appended claims.

What is claimed is:

**1**. Circuit arrangement for a switch-mode power supply, wherein the switch-mode power supply has a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer,

wherein the circuit arrangement (**100**) comprises a primary-sided switch (**102**), a control circuit (**104**) for controlling the primary-sided switch (**102**) and additional active, primary-sided components (**106**, **108**, **110**),

wherein said control circuit (**104**) is formed by a first integrated semiconductor chip and the primary-sided switch (**102**) and the additional components (**106**, **108**, **110**), are integrated in at least one additional semiconductor chip, said semiconductor chip being separate from the control circuit and arranged on a circuit carrier (**112**) shared with the control circuit.

**2**. Circuit arrangement according to claim **1**, wherein the control circuit (**104**), the primary-sided switch (**102**) and the additional primary-sided components (**106**, **108**, **110**) are accommodated in a shared housing (**118**).

**3**. Circuit arrangement according to claim **2**, wherein the housing (**118**) is executed as a wired housing.

**4**. Circuit arrangement according to claim **2**, wherein the housing (**118**) is executed as a housing that can be surface-mounted for surface-mount technologies.

**5**. Circuit arrangement according to claim **1**, wherein the circuit carrier is executed as a leadframe (**112**).

**6**. Circuit arrangement according to claim **1**, wherein a metallization of the circuit carrier (**112**) has cooling areas that are formed for removing heat.

**7**. Circuit arrangement according to claim **1**, wherein the additional active components comprise four rectifier diodes (**106**).

**8**. Circuit arrangement according to claim **1**, wherein the additional active components comprise a diode (**108**) for the auxiliary power supply.

**9**. Circuit arrangement according to claim **1**, wherein the additional active components comprise a snubber diode (**110**).

**10**. Circuit arrangement according to claim **1**, wherein the additional active components (**106**, **108**, **110**) are at least partially combined into a single semiconductor chip and are monolithically integrated.

**11**. Circuit arrangement according to claim **1**, wherein at least those additional components (**106**, **108**, **110**) that are

Samsung, EX1001, p. 7

US 7,403,399 B2

7

under high voltages are executed in a silicon-on-insulator technology and the control circuit (**104**) is formed as a silicon semiconductor circuit.

**12**. Circuit arrangement according to claim **1**, wherein the circuit carrier has a ceramic substrate comprising multiple layers.

**13**. Switch-mode power supply having a primary side, which can be connected to a supply voltage, and a secondary side, which can be connected to a consumer,

said switch-mode power supply comprising a circuit arrangement which comprises a primary-sided switch, a

8

control circuit for controlling the primary-sided switch and additional active, primary-sided components,

wherein said control circuit is formed by a first integrated semiconductor chip and the primary-sided switch and the additional components, are integrated in at least one additional semiconductor chip, said semiconductor chip being separate from the control circuit and arranged on a circuit carrier shared with the control circuit.

\* \* \* \* \*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 22nd day of September, 2023, I caused this

Brief of Appellant to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to all registered CM/ECF

users.


*/s/ Minghui Yang*
*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*4,499*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: September 22, 2023              /s/ *Minghui Yang*
                                       *Counsel for Appellant*